COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-042-CR

 

 

JOSEPH FLENTON TORREY                                                   APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                            Introduction








Appellant Joseph Flenton Torrey appeals his
conviction for capital murder.  In four
points, Torrey asserts that the evidence supporting his conviction is legally
and factually insufficient, that the trial court wrongly denied his motion for
a mistrial, and that the trial court erred by refusing to include a requested
jury instruction.  We affirm.

                                        Background
Facts

Because Torrey=s first
two points distinguish the effect of accomplice testimony from the effect of
the trial=s remaining testimony, we will
segregate the information gathered from such accomplice testimony in our brief
summary of the facts related to Torrey=s
conviction.

Evidence presented from Fa=nae
Anderson=s accomplice testimony[2]

Fa=nae
Anderson was Torrey=s girlfriend at the time of
Torrey=s crimes.
In January 2007, Anderson and Torrey lived with Anderson=s
sister, La=Tora Esters, at an apartment on
Terminal Road.








One night that month,  Torrey woke Anderson, and he told her that
they were going to Ahit a lick.@[3]  After making a couple of stops in a car,
Anderson and Torrey (who was carrying a black .45 caliber gun) went to Vinetta
Street. They pulled in front of a known drug house on that street, and then
Torrey left the car and knocked on the house=s front
door.  Someone opened the door, and
Torrey went inside.  After Torrey had
been inside Aa minute or less,@
Anderson heard three gunshots.  Torrey ran
out of the house carrying a blue backpack. 
Anderson asked Torrey what had happened; Torrey responded, AThem
niggas dead.@ 
Anderson and Torrey drove to Trinity Boulevard, and after Torrey took a
magazine clip out of his gun, he threw the gun in a gutter.  When Anderson and Torrey arrived back at
Esters=s house,
Anderson opened the blue backpack, which contained drugs, scales, and
money.  Anderson and Torrey then burned
the backpack in the back of Esters=s
apartment.

The next morning, Torrey gave the gun magazine
clip to Anderson in a plastic grocery bag, and he told her to dispose of
it.  Anderson gave the plastic bag to
Esters, and Esters threw it into a storm drain. 
That same day, Anderson and Torrey talked about what had occurred the
previous night; Torrey said that Ahe asked
the dudes what they have, and then one of them sat down on the couch and was
looking through the bag, and [Torrey] shot him. 
[Torrey] shot the first guy, and then he shot the second guy.@








Evidence presented from nonaccomplice testimony

Esters=s
testimony

While Anderson and Torrey were staying with
Esters, Torrey brought a gun to Esters=s
apartment, and he took it with him when he left the apartment.  Anderson and Torrey left the apartment one
night around midnight; they returned the next morning around six o=clock
with drugs, money, a scale, and a blue backpack.  When Torrey arrived at Esters=s apartment
that morning, he told Esters that he had just Ahit
himself an easy lick@;[4]
he and Anderson then took items out of the backpack and counted money.

While Anderson was driving Esters and Torrey to
get donuts that same morning, Torrey took a plastic bag out of his pocket and
told Anderson to throw it in a sewer. 
Anderson then asked Esters to throw the bag in the sewer; Esters noticed
a gun magazine clip in the bag, and then she complied with Anderson=s
request.  After returning to Esters=s
apartment, Torrey told Esters that he had to Ause his
baby.@[5]








A few days later, Esters saw a news story on
television about Nicholas Davis=s
death.  While Esters was speaking with
Torrey about the news story, he revealed to her that Anderson had driven him to
the house on Vinetta Street and that he had killed Davis and Brian Wilson.[6]  Esters told the police about Torrey=s
statement and about her disposal of the plastic bag and the gun magazine clip,
and she gave the police consent to search her apartment, where she said that
they could find a burned blue backpack that Torrey had used.

Other nonaccomplice testimony

On the morning of January 17, 2007, after the
victims=[7] friends
found the victims= bodies, Fort Worth police
officers received a call, went to the Vinetta Street address, spoke with the
victims= friends
and other individuals, and concluded that the victims were dead.[8]  The officers obtained a search warrant.








After entering the two-bedroom house, the
officers took still pictures and video of the scene, examined the victims= bodies
and the couches that the victims were slumped over on, and collected three .45
caliber fired shell casings, latent fingerprints,[9]
and other various items (including a gun and ammunition that officers
determined to be unrelated to the crime).

On the early morning of January 20, 2007, Esters
spoke with Fort Worth Police Department Detective Angela Jay about what Torrey
had told Esters and Esters=s other
knowledge related to the murders.  Esters
eventually led Detective Jay to where Esters had discarded the gun clip;
officers found a white plastic bag containing a .45 caliber pistol magazine
clip at that location.[10]  Detective Jay prepared arrest warrants for
Torrey and Anderson, and officers arrested Torrey and Anderson that morning at
Esters=s
Terminal Road apartment.

On January 23, 2007, officers executed a search
warrant on Esters=s apartment.[11]  While executing the warrant, officers found
(among other items) Torrey=s
identification card and a burned blue backpack.








Later that month, a criminalist who works for the
Fort Worth Police Department examined the three spent shell casings that the
officers had found with a comparison microscope, and he determined that they
were fired from the same gun.  He could
not form an opinion, however, on whether the three casings had passed through
the magazine clip that had been found in the plastic bag.

The procedural history of Torrey=s case

In April 2007, a Tarrant County grand jury
indicted Torrey with capital murder, alleging that he killed Wilson and Davis
in the same transaction and that he killed them in the course of committing
robbery.  See Tex. Penal Code Ann.
' 19.03(a)(2),
(a)(7)(A) (Vernon Supp. 2008).  After the
parties filed various pretrial documents,[12]
Torrey=s trial
began with the voir dire of the jury panel; Torrey then pled not guilty to the
indictment=s allegations.

After the parties presented their cases, they
submitted closing arguments, and the jury convicted Torrey of capital
murder.  The trial court sentenced him to
life in prison, and then he timely filed his notice of this appeal.








                   The Legal and
Factual Sufficiency of the Evidence

                 and the
Sufficiency of the Nonaccomplice Testimony

 

In his first two points, Torrey challenges the
legal and factual sufficiency of the evidence to Asupport
the jury=s
determination that he (as opposed to another person) murdered@ Davis
and Wilson.  He contends that there is no
forensic evidence such as fingerprints or DNA that links him to the
crimes.  He also asserts that there
is no evidence tending to connect him to the crimes apart from Anderson=s
accomplice testimony.

Legal and factual sufficiency

Standards of review








In reviewing the legal sufficiency of the
evidence to support a conviction, we view all of the evidence in the light most
favorable to the prosecution in order to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235
S.W.3d 772, 778 (Tex. Crim. App. 2007). 
The trier of fact is the sole judge of the weight and credibility of the
evidence.  See Tex. Code Crim.
Proc. Ann. art. 38.04 (Vernon 1979); Brown v. State, 270 S.W.3d 564, 568
(Tex. Crim. App. 2008).  Thus, when
performing a legal sufficiency review, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the
factfinder.  Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).

Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778. 








When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Neal v.
State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), cert. denied, 129
S. Ct. 1037 (2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008); Watson, 204 S.W.3d at 414B15, 417.  To reverse under the second ground, we must
determine, with some objective basis in the record, that the great weight and
preponderance of all the evidence, although legally sufficient, contradicts the
verdict.  Watson, 204 S.W.3d at
417.

In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson v. State, 23 S.W.3d 1, 12
(Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).

Analysis








Here, the evidence is legally sufficient to
establish Torrey=s identity as Davis=s and
Wilson=s
murderer.  Evidence as to the identity of
the perpetrator of an offense can be proved by direct or circumstantial
evidence.  Earls v. State, 707
S.W.2d 82, 85 (Tex. Crim. App. 1986); Couchman v. State, 3 S.W.3d
155, 162 (Tex. App.CFort Worth 1999, pet. ref=d).  Such identity may be established by an
extrajudicial confession alone.  See
Emery v. State, 881 S.W.2d 702, 706 (Tex. Crim. App. 1994), cert. denied,
513 U.S. 1192 (1995); Gribble v. State, 808 S.W.2d 65, 70B71 (Tex.
Crim. App. 1990), cert. denied, 501 U.S. 1232 (1991); Tidrow v. State,
916 S.W.2d 623, 630 (Tex. App.CFort
Worth 1996, no pet.); see also Capps v. State, 244 S.W.3d 520, 526 (Tex.
App.CFort
Worth 2007, pet. ref=d) (mem. op. on PDR) (affirming
the defendant=s conviction for murdering his
wife because, in part, A[s]everal women testified that
[he] had hinted about or admitted to killing or having hired someone else to
kill [her]@).

Torrey=s
extrajudicial confession to Esters unequivocally established that he and
Anderson drove to the house on Vinetta Street, where he killed Davis and
Wilson.  Thus, the evidence enabled a
rational trier of fact to convict Torrey, and it is legally sufficient.








The evidence supporting Torrey=s
conviction is likewise factually sufficient. 
Torrey did not submit any evidence contradicting the testimony from
Esters or Anderson that he committed the murders, and nothing in the record
could suggest that anyone other than Torrey killed Davis and Wilson.  Also, the physical evidence found by
officers, such as the burned blue backpack, the gun clip that was found in the
plastic bag, and the .45 caliber bullet casings, corroborated portions of
Esters=s and
Anderson=s
testimony that related to each of these items. 
For these reasons, and also in consideration of the remaining facts
recited above, we hold that the evidence submitted at trial was not so weak as
to make the jury=s decision to convict Torrey
clearly wrong or manifestly unjust; therefore, his conviction was based on
factually sufficient evidence.

The accomplice-witness rule

Applicable legal standards

A conviction Acannot
be had upon the testimony of an accomplice unless corroborated by other
evidence tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.@  Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon
2005).  To be an accomplice, the person
must be susceptible to prosecution for the offense with which the accused is
charged or a lesser-included offense.  See
Medina, 7 S.W.3d at 641.








When evaluating the sufficiency of corroboration
evidence under the accomplice-witness rule, we Aeliminate
the accomplice testimony from consideration and then examine the remaining
portions of the record to see if there is any evidence that tends to connect
the accused with the crime.@  Malone v. State, 253 S.W.3d 253, 257
(Tex. Crim. App. 2008) (quoting Solomon v. State, 49 S.W.3d 356, 361
(Tex. Crim. App. 2001)).  To meet the
requirements of the rule, the corroborating evidence need not prove the
defendant=s guilt beyond a reasonable
doubt by itself.  Id.  Nor is it necessary for the corroborating
evidence to directly link the accused to the commission of the offense.  Cathey v. State, 992 S.W.2d 460, 462
(Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).

Rather, the evidence must simply link the accused
in some way to the commission of the crime and show that Arational
jurors could conclude that this evidence sufficiently tended to connect [the
accused] to the offense.@  Malone, 253 S.W.3d at 257 (quoting Hernandez
v. State, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)).  AIndependent
evidence which generally tends to prove that an accomplice witness=s
version of events is true, rather than the version given by the defendant, is
considered corroborative, even if it concerns a mere >detail,= as
opposed to a substantive link between the defendant and commission of the
offense.@  Beathard v. State, 767 S.W.2d 423, 430
(Tex. Crim. App. 1989); see also Munoz v. State, 853 S.W.2d 558, 559
(Tex. Crim. App. 1993) (noting that A[a]pparently
insignificant incriminating circumstances may sometimes afford satisfactory
evidence of corroboration@).

Analysis








Esters=s
testimony about Torrey=s extrajudicial confession to
her of the murders, along with the physical evidence described above that
strengthened Esters=s testimony, provided enough
evidence independent of Anderson=s
testimony to support his conviction.  See
Joubert v. State, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007) (holding that
the Aappellant=s
admission that he participated in the crime, although he denied being a
shooter, [was] enough to tend to connect him to the offense@), cert.
denied, 128 S. Ct. 1446 (2008); Medina, 7 S.W.3d at 642 (holding
that extrajudicial letters from the appellant that indicated his guilt were
sufficient to tend to connect him to murder); Thompson v. State, 54
S.W.3d 88, 94 (Tex. App.CTyler 2001, pet. ref=d)
(explaining that a Adefendant=s
confession may be sufficient to corroborate the testimony of an accomplice, so
long as proof of the confession does not depend upon the testimony of the
accomplice@).

Torrey asserts that because of the familial
relationship between Esters and Anderson, the testimony of Esters should not be
deemed sufficient to corroborate the story told by Anderson.  However, he cites no authority supporting his
assertion that a familial relationship of a nonaccomplice witness to an
accomplice witness affects the weight of the nonaccomplice witness=s
testimony, nor have we found any such authority.  Thus, Esters=s
testimony was sufficiently corroborative; it tended to connect Torrey to the
murders.  See Tex. Code Crim.
Proc. Ann. art. 38.14.

For all of these reasons, we overrule Torrey=s first
two points.

                       The
Denial of Torrey=s Motion for a Mistrial








In his third point, Torrey contends that the
trial court erred by denying his motion for a mistrial; he asserts that a juror=s
conversation with a co-worker denied him due process.  Following a lunch break on the first day of
testimony during Torrey=s trial, the following exchange
occurred between the trial judge and a juror in the judge=s
chambers:

THE COURT:               You=re Ms. Alexander, right?

 

JUROR ALEXANDER:    Yes.

 

THE COURT:               I got a message that you think you
might know one of the witnesses for the State?

 

JUROR ALEXANDER:    Yes.

 

THE COURT:               Do you know who ‑‑

 

JUROR ALEXANDER:    Not the witness.

 

THE COURT:               Who?

 

JUROR ALEXANDER:    I think she=s going to be in the
audience.  She just arrived.  She just said she got off work, and I used to
work with her.

 

THE COURT:               You talked to her in the hallway?

 

JUROR ALEXANDER:    Yeah.

 

THE COURT:               You know you are not supposed to
talk to anybody?

 

JUROR ALEXANDER:    Oh.

 

THE COURT:               Remember?

 

JUROR ALEXANDER:    I just asked her how was she doing.

 








THE COURT:               That=s fine.  And I didn=t make that clear probably because I told you not
to talk about the case, but the people who are here around the courtroom are here
for this case, and so you can=t talk to them at all, but that=s okay.  We=ll talk about that later.  So what=s her name?

 

JUROR ALEXANDER:    Tye Smith.

 

THE COURT:               Tye Smith.  And how do you know her?

 

JUROR ALEXANDER:    I used to work with her at Cash America.

 

THE COURT:               And tell me ‑‑ tell me
what y=all said out there.

 

JUROR ALEXANDER:    She ‑‑ I asked her had she seen
my baby yet because I just had a baby.

 

THE COURT:               Congratulations.

 

JUROR ALEXANDER:    Thank you. 
And I showed her the pictures, and I said, ADo you have jury duty
today?@  And she was like, ANo.@  She said, AI=m here on trial for ‑‑ I=m here for a trial for my
cousin.@  I said, AOh, do you know what floor you=re going to be on?@  She said, AFive.@  I said, AOkay, we are probably in the
same room.@

 

THE COURT:               Where did you run into her?

 

JUROR ALEXANDER:    We was in the snack bar.

 

THE COURT:               Down on the first floor?

 

JUROR ALEXANDER:    Yeah.

 

THE COURT:               There is no way you would have
known.  So, any problems with that?

 

JUROR ALEXANDER:    No.








 

THE COURT:               Do you think that you=re going to need to vote
in favor of the State because you know one of their family members?

 

JUROR ALEXANDER:    No.

 

THE COURT:               Is knowing this person, Tye Smith,
going to cause you to judge the evidence you hear differently?

 

JUROR ALEXANDER:    No.

 

THE COURT:               Is it going to cause you to be
biased at all?

 

JUROR ALEXANDER:    No.

 

THE COURT:               Can you make a decision in this
case based just on the facts and the law and not on any relationship?

 

JUROR ALEXANDER:    Yes.

 

THE COURT:               So if you decided to find the
defendant not guilty, is that going to cause you a problem since you know a
family member of the victim?

 

JUROR ALEXANDER:    No.

 

THE COURT:               You sure?

 

JUROR ALEXANDER:    Uh‑huh. I don=t even see her.  I haven=t seen her since I quit that job back in March of
last year.

 

THE COURT:               So, it=s not the kind of
relationship that would cause you any problems?

 

JUROR ALEXANDER:    No.

 

THE COURT:               Do y=all live near each other?

 








JUROR ALEXANDER:    I don=t know where she stay.

 

THE COURT:               Well, all right.  Anything else you want to tell me?

 

JUROR ALEXANDER:    No.

 

The trial judge informed the parties about this conversation, and then
the following colloquy took place between the trial judge, the State=s
attorneys (Ms. Guy and Ms. Johnson), and Torrey=s
counsel (Mr. Cummings):

MR. CUMMINGS:         I don=t know who Tye Smith is nor who  Tye is related to.

 

MS. GUY:                   And I=m not familiar with Tye
Smith.  That name doesn=t ring a bell.

 

MR. CUMMINGS:         You=re not very helpful.

 

MS. GUY:                   I=m sorry, I was just
sitting here listening.

 

MS. JOHNSON:           Betsy Smith, I wonder.

 

MS. GUY:                   Maybe.  Betsy is the mother of one of the victims.

 

THE COURT:               I mean, I don=t think it matters.  I said, I don=t think it matters.  You know, the record is that she reported it
as soon as she was supposed to.  She did
that.  She knows not to talk to people
about the case.  When she heard they were
coming to the fifth floor, she quit talking. 
As far as I can tell, there is no juror misconduct.  She has stated for the record that it would
make absolutely no difference to her at all and, you know, I=m just telling you‑all
because I=m supposed to tell you.

 

MR. CUMMINGS:         You made inquiry in chambers on the
record?








 

THE COURT:               Oh, yes.

 

MR. CUMMINGS:         Okay.

 

THE COURT:               And it=s there, and you can have
it.  And I think I recited it relatively
close to what actually was said, because it hasn=t been that long.  Tomorrow I won=t remember, but . . .

 

. . .
.

 

MR. CUMMINGS:         Your Honor, I think in the interest of
my client, I am going to go ahead and move for a mistrial based upon what you
just said.

 

THE COURT:               That=s denied.

 

MR. CUMMINGS:         Thank
you, Your Honor.

Applicable legal standards








We review a trial court=s ruling
on a motion for a mistrial using an abuse of discretion standard, viewing the
record in the light most favorable to the trial court=s ruling
and upholding that ruling if it was within the zone of reasonable
disagreement.  See Webb v. State,
232 S.W.3d 109, 112 (Tex. Crim. App. 2007); Stewart v. State, 221 S.W.3d
306, 310 (Tex. App.CFort Worth 2007, no pet.); see
also Gamboa v. State, No. AP‑75,635, 2009 WL 928552, at *7 (Tex.
Crim. App. Apr. 8, 2009) (applying the abuse of discretion standard to the
denial of a motion for a mistrial based on alleged jury misconduct).  A trial court abuses its discretion in
denying a motion for a mistrial only when no reasonable view of the record
could support the court=s ruling.  Webb, 232 S.W.3d at 112.








When reviewing a trial court=s
decision regarding potential jury misconduct, an appellate court should defer
to the trial court=s resolution of the historical
facts and its determinations concerning credibility and demeanor.  See Quinn v. State, 958 S.W.2d
395, 401 (Tex. Crim. App. 1997).  Thus,
if the trial court believes a juror=s
statements that despite having an alleged improper communication with a third
party, the juror can still render an impartial verdict, an appellate court
should generally defer to the trial court=s
decision to deny a mistrial.  See Robinson
v. State, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991), cert. denied,
512 U.S. 1246 (1994); see also Gamboa, 2009 WL 928552, at *7 (holding
that because a juror testified that he could remain impartial despite
overhearing a conversation about the case he was serving on, the trial court
did not abuse its discretion in denying a mistrial); Quinn, 958 S.W.2d
at 402 (holding that despite a juror=s
statement to a coworker during the middle of a trial that a defendant on trial
for sexual assault should Aplay
drop the soap,@ the appellate court should have
deferred to the trial court=s denial
of a motion for new trial because the trial court was Afree to
believe@
testimony that the juror Awas not in any way influenced@).  Also, a juror=s Atangential
acquaintance@ with someone connected to a
trial does not justify reversal of a defendant=s
conviction when the juror affirms that he or she can be fair and render a fair
verdict.  See Anderson v. State,
633 S.W.2d 851, 853B54 (Tex. Crim. App. [Panel Op.]
1982) (holding that the trial court=s denial
of a challenge to the juror=s
qualifications for cause was not reversible error).

Analysis

As Torrey concedes in his brief, the relationship
between Ms. Smith to Torrey=s case,
if any, is unclear.  None of juror
Alexander, Torrey=s counsel, nor the State=s
attorneys knew of Ms. Smith=s
connection to Torrey or the victims.  Ms.
Smith was not called as a witness to either establish her connection to the
case or to testify as a fact witness to Torrey=s
crime.  Alexander, after discovering that
Ms. Smith was present for a trial on the same floor of the courthouse as the
case Alexander was serving on, merely indicated to the trial judge, AI think
[Ms. Smith] is going to be in the audience@;
nothing in the record indicates that Ms. Smith actually observed the
proceedings. 

Next, regardless of any relationship that Ms.
Smith may have had to either Torrey or the victims, Alexander affirmed to the
trial court that her former co-worker relationship with Ms. Smith would not
influence her verdict, would not cause her to be biased, and would not cause
her to judge evidence differently.  The
trial court recited Alexander=s
affirmation in this regard when it decided that there had been no misconduct.








Also, the record establishes that Alexander=s
relationship to Ms. Smith was tangential. 
Alexander stated that she had not had contact with Ms. Smith in almost a
year=s time.[13]  Alexander also indicated that she did not
know where Ms. Smith lived and that her relationship with Ms. Smith was not the
kind that would cause her any problems.

Finally, when Alexander received the first
indication that Ms. Smith could have been connected with Torrey=s case,
she terminated the conversation. 
The conversation never developed to concern the facts of Torrey=s case,
Torrey=s guilt
or innocence, sympathetic statements regarding the victims, or other related
matters.[14]  See Kelly v. State, 792 S.W.2d 579,
587 (Tex. App.CFort Worth 1990) (deciding that
the trial court correctly overruled the defendant=s motion
for a mistrial because a juror=s
comments Adid not constitute conversations
about [the defendant=s] specific case,@ and
there was therefore Ano injury@), aff=d, 824
S.W.2d 568 (Tex. Crim. App. 1992).








For these reasons, applying the standards set
forth above, we conclude that the trial court did not abuse its discretion by
denying Torrey=s motion for a mistrial based on
Alexander=s alleged misconduct.  Therefore, we overrule Torrey=s third
point.

         The
Exclusion of a Lesser-included Offense from the Jury Charge








In his fourth point, Torrey contends that the
trial court erred by refusing to include his requested jury instruction
regarding the lesser-included offense of aggravated robbery.[15]  We use a two-step analysis to determine
whether Torrey was entitled to a lesser-included offense instruction.  Hall v. State, 225 S.W.3d 524, 528
(Tex. Crim. App. 2007); Rousseau v. State, 855 S.W.2d 666, 672B73 (Tex.
Crim. App.), cert. denied, 510 U.S. 919 (1993).  First, the lesser offense must come within
article 37.09 of the code of criminal procedure.  Tex. Code Crim. Proc. Ann. art. 37.09
(Vernon 2006); Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App.
1998).  AAn
offense is a lesser included offense if . . . it is established by proof of the
same or less than all the facts required to establish the commission of the
offense charged.@ 
Tex. Code Crim. Proc. Ann. art. 37.09(1); see also Hall, 225
S.W.3d at 536.  This inquiry is a
question of law.  Hall, 225 S.W.3d
at 535.  It does not depend on the
evidence to be produced at trial but is performed by comparing the elements of
the offense as they are alleged in the indictment or information with the
elements of the potential lesser-included offense.  Id. at 525, 535B36.

Second, some evidence must exist in the record
that would permit the jury to rationally find that if Torrey is guilty, he is
guilty only of the lesser offense.  Hall,
225 S.W.3d at 536; Salinas v. State, 163 S.W.3d 734, 741 (Tex. Crim.
App. 2005); Rousseau, 855 S.W.2d at 672B73.  The evidence must be evaluated in the context
of the entire record.  Moore, 969
S.W.2d at 8.  There must be some evidence
from which a rational jury could acquit the Torrey of the greater offense
(capital murder) while convicting him of the lesser-included offense
(aggravated robbery).  See id.  The court may not consider whether the
evidence is credible, controverted, or in conflict with other evidence.  See id.  Anything more than a scintilla of evidence
may be sufficient to entitle Torrey to a lesser charge.  See Hall, 225 S.W.3d at 536.








As the State concedes, aggravated robbery, under
the legal theory alleged in counts two and three of Torrey=s
indictment, is a lesser-included offense of capital murder under article 37.09.[16]  See Bradford v. State,  178 S.W.3d 875, 877 (Tex. App.CFort
Worth 2005, pet. ref=d); Martinez v. State,
131 S.W.3d 22, 39 (Tex. App.CSan
Antonio 2003, no pet.) (explaining that because Athe
proof necessary for capital murder committed in the course of a robbery
contains the elements necessary for aggravated robbery, aggravated robbery may
be a lesser included offense of capital murder@).  Thus, Torrey has satisfied the first
prong of the test described above.








However, he cannot satisfy the second prong,
because no jury could rationally find that, under the evidence presented, he
was guilty of aggravated robbery but not guilty of capital murder.  See Hall, 225 S.W.3d at 536; Salinas,
163 S.W.3d at 741.  A person commits
aggravated robbery when the person commits robbery[17]
and the person also (1) causes serious bodily injury to another; (2) uses or
exhibits a deadly weapon; or (3) causes bodily injury to another person or
threatens or places another person in fear of imminent bodily injury or death,
if the other person is 65 years of age or older or disabled.  Tex. Penal Code Ann. ' 29.03(a)
(Vernon 2003).[18]  Here, no jury could rationally determine from
the evidence described above that Torrey caused serious bodily injury to Davis
and Wilson or that he used a deadly weapon against them, but that he did not
intentionally kill them.  Torrey did not
present any theory at trial regarding an alternate cause of Davis=s and
Wilson=s death;
rather, during closing arguments, his counsel theorized that Anderson=s and
Esters=s
testimony was untruthful, and counsel also emphasized that there was no DNA or
other physical evidence directly linking him to the scene of the murders. 

If the jury had believed Torrey=s
counsel, and if it had completely discounted Anderson=s and
Esters=s
testimony, it would have concluded that Torrey was not at the crime scene, and
it could not have convicted Torrey of aggravated robbery.  Thus, he was not entitled to an aggravated
robbery instruction.  See Hall,
225 S.W.3d at 536; Salinas, 163 S.W.3d at 741.  We therefore overrule his fourth point.








                                             Conclusion

Having overruled all of Torrey=s
points, we affirm the trial court=s
judgment. 

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, WALKER, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  June 4, 2009











[1]See Tex. R. App. P. 47.4.





[2]Anderson pled guilty to
aggravated robbery for events related to this case.  The trial court concluded that she was an
accomplice to Torrey=s charges as a matter of
law; neither party has challenged her status as an accomplice on appeal.  Anderson was an accomplice because she was
susceptible to being charged (and was in fact convicted for) aggravated
robbery, which as explained below, is a lesser-included offense of murder under
the indictment in this case.  See
Medina v. State, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999), cert.
denied, 529 U.S. 1102 (2000); see also Tex. Penal Code Ann. ' 7.02 (Vernon 2003)
(assessing criminal responsibility for another person=s actions in certain
circumstances).





[3]Anderson indicated that
she understood Ahit a lick@ to mean that Torrey
wanted to rob someone.  Torrey had talked
on previous occasions with Anderson about Ahitting a lick.@





[4]Esters understood Ahitting an easy lick@ to mean stealing
something.





[5]Esters testified that
Torrey used the Ababy@ moniker to describe his
gun.  She also stated that she had
previously heard Torrey state that he owned a .45 caliber gun.





[6]Esters stated at trial,

 

[Torrey] had just said that [he and Anderson] had went to the house,
and he went in there and asked [one of the victims] to serve him a[n] X pill. .
. .  He didn=t say which one he asked
to serve him the X pill, but he got an X pill . . . [and] he shot him in the
head.  Then he shot the other boy
too.  And one of them was supposed to got
shot twice and one of them was supposed to had got shot once.





[7]Testimony indicated that
Wilson and Davis sold drugs at the Vinetta Street address.





[8]The officers= conclusion was later
confirmed by a deputy medical examiner, who explained that Davis and Wilson
died from gunshots. 





[9]None of the fingerprints
that the officers collected matched Torrey=s fingerprints.





[10]Esters confirmed while
testifying that the clip officers found was the same clip that she threw in the
sewer.





[11]Esters also gave officers
consent to search the apartment.





[12]For instance, the State
filed a notice that it was not seeking the death penalty for Torrey=s crimes.  Torrey filed a document in which he
designated the jury to assess his punishment upon his conviction.





[13]Alexander indicated that
she had not seen Ms. Smith since AMarch of last year@; Torrey=s trial occurred in
February 2008.





[14]We note that Torrey has
not cited any authority holding that there was reversible juror misconduct
under facts analogous to those in this case.





[15]During the parties= discussion of the jury
charge with the trial judge, Torrey=s counsel requested the inclusion of an
application paragraph for aggravated robbery; the trial court denied this
request.





[16]Counts two and three
essentially alleged that Torrey committed capital murder because he
intentionally caused Wilson=s and Davis=s death while 
committing robbery.  See Tex.
Penal Code Ann. ' 19.03(a)(2).





[17]See Tex. Penal Code Ann. ' 29.02. (Vernon
2003).





[18]Nothing in the record
indicates that either Davis or Wilson were over sixty-five years old or that
they were disabled.  We will limit our
analysis to the first two ways of committing aggravated robbery as described by
section 29.03(a).