

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-042-CR**

JOSEPH FLENTON TORREY                                          APPELLANT

V.

THE STATE OF TEXAS                                                     STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 1 OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellant Joseph Flenton Torrey appeals his conviction for capital murder. In four points, Torrey asserts that the evidence supporting his conviction is legally and factually insufficient, that the trial court wrongly denied his motion

---

[1] *See* Tex. R. App. P. 47.4.

for a mistrial, and that the trial court erred by refusing to include a requested jury instruction. We affirm.

## Background Facts

Because Torrey's first two points distinguish the effect of accomplice testimony from the effect of the trial's remaining testimony, we will segregate the information gathered from such accomplice testimony in our brief summary of the facts related to Torrey's conviction.

### Evidence presented from Fa'nae Anderson's accomplice testimony[2]

Fa'nae Anderson was Torrey's girlfriend at the time of Torrey's crimes. In January 2007, Anderson and Torrey lived with Anderson's sister, La'Tora Esters, at an apartment on Terminal Road.

One night that month, Torrey woke Anderson, and he told her that they were going to "hit a lick."[3] After making a couple of stops in a car, Anderson

---

[2] Anderson pled guilty to aggravated robbery for events related to this case. The trial court concluded that she was an accomplice to Torrey's charges as a matter of law; neither party has challenged her status as an accomplice on appeal. Anderson was an accomplice because she was susceptible to being charged (and was in fact convicted for) aggravated robbery, which as explained below, is a lesser-included offense of murder under the indictment in this case. *See Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000); *see also* Tex. Penal Code Ann. § 7.02 (Vernon 2003) (assessing criminal responsibility for another person's actions in certain circumstances).

[3] Anderson indicated that she understood "hit a lick" to mean that Torrey wanted to rob someone. Torrey had talked on previous occasions with

2

and Torrey (who was carrying a black .45 caliber gun) went to Vinetta Street. They pulled in front of a known drug house on that street, and then Torrey left the car and knocked on the house's front door. Someone opened the door, and Torrey went inside. After Torrey had been inside "a minute or less," Anderson heard three gunshots. Torrey ran out of the house carrying a blue backpack. Anderson asked Torrey what had happened; Torrey responded, "Them niggas dead." Anderson and Torrey drove to Trinity Boulevard, and after Torrey took a magazine clip out of his gun, he threw the gun in a gutter. When Anderson and Torrey arrived back at Esters's house, Anderson opened the blue backpack, which contained drugs, scales, and money. Anderson and Torrey then burned the backpack in the back of Esters's apartment.

The next morning, Torrey gave the gun magazine clip to Anderson in a plastic grocery bag, and he told her to dispose of it. Anderson gave the plastic bag to Esters, and Esters threw it into a storm drain. That same day, Anderson and Torrey talked about what had occurred the previous night; Torrey said that "he asked the dudes what they have, and then one of them sat down on the couch and was looking through the bag, and [Torrey] shot him. [Torrey] shot the first guy, and then he shot the second guy."

_____

Anderson about "hitting a lick."

3

**Evidence presented from nonaccomplice testimony**

**Esters's testimony**

While Anderson and Torrey were staying with Esters, Torrey brought a gun to Esters's apartment, and he took it with him when he left the apartment. Anderson and Torrey left the apartment one night around midnight; they returned the next morning around six o'clock with drugs, money, a scale, and a blue backpack. When Torrey arrived at Esters's apartment that morning, he told Esters that he had just "hit himself an easy lick";[4] he and Anderson then took items out of the backpack and counted money.

While Anderson was driving Esters and Torrey to get donuts that same morning, Torrey took a plastic bag out of his pocket and told Anderson to throw it in a sewer. Anderson then asked Esters to throw the bag in the sewer; Esters noticed a gun magazine clip in the bag, and then she complied with Anderson's request. After returning to Esters's apartment, Torrey told Esters that he had to "use his baby."[5]

A few days later, Esters saw a news story on television about Nicholas Davis's death. While Esters was speaking with Torrey about the news story,

---

[4] Esters understood "hitting an easy lick" to mean stealing something.

[5] Esters testified that Torrey used the "baby" moniker to describe his gun. She also stated that she had previously heard Torrey state that he owned a .45 caliber gun.

4

he revealed to her that Anderson had driven him to the house on Vinetta Street and that he had killed Davis and Brian Wilson.[6]  Esters told the police about Torrey's statement and about her disposal of the plastic bag and the gun magazine clip, and she gave the police consent to search her apartment, where she said that they could find a burned blue backpack that Torrey had used.

**Other nonaccomplice testimony**

On the morning of January 17, 2007, after the victims'[7] friends found the victims' bodies, Fort Worth police officers received a call, went to the Vinetta Street address, spoke with the victims' friends and other individuals, and concluded that the victims were dead.[8]  The officers obtained a search warrant.

After entering the two-bedroom house, the officers took still pictures and video of the scene, examined the victims' bodies and the couches that the

---

[6] Esters stated at trial,

> [Torrey] had just said that [he and Anderson] had went to the house, and he went in there and asked [one of the victims] to serve him a[n] X pill. . . .  He didn't say which one he asked to serve him the X pill, but he got an X pill . . . [and] he shot him in the head. Then he shot the other boy too.  And one of them was supposed to got shot twice and one of them was supposed to had got shot once.

[7] Testimony indicated that Wilson and Davis sold drugs at the Vinetta Street address.

[8] The officers' conclusion was later confirmed by a deputy medical examiner, who explained that Davis and Wilson died from gunshots.

victims were slumped over on, and collected three .45 caliber fired shell casings, latent fingerprints,[9] and other various items (including a gun and ammunition that officers determined to be unrelated to the crime).

On the early morning of January 20, 2007, Esters spoke with Fort Worth Police Department Detective Angela Jay about what Torrey had told Esters and Esters's other knowledge related to the murders. Esters eventually led Detective Jay to where Esters had discarded the gun clip; officers found a white plastic bag containing a .45 caliber pistol magazine clip at that location.[10] Detective Jay prepared arrest warrants for Torrey and Anderson, and officers arrested Torrey and Anderson that morning at Esters's Terminal Road apartment.

On January 23, 2007, officers executed a search warrant on Esters's apartment.[11] While executing the warrant, officers found (among other items) Torrey's identification card and a burned blue backpack.

Later that month, a criminalist who works for the Fort Worth Police Department examined the three spent shell casings that the officers had found

---

[9] None of the fingerprints that the officers collected matched Torrey's fingerprints.

[10] Esters confirmed while testifying that the clip officers found was the same clip that she threw in the sewer.

[11] Esters also gave officers consent to search the apartment.

with a comparison microscope, and he determined that they were fired from the same gun. He could not form an opinion, however, on whether the three casings had passed through the magazine clip that had been found in the plastic bag.

**The procedural history of Torrey's case**

In April 2007, a Tarrant County grand jury indicted Torrey with capital murder, alleging that he killed Wilson and Davis in the same transaction and that he killed them in the course of committing robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2), (a)(7)(A) (Vernon Supp. 2008). After the parties filed various pretrial documents,[12] Torrey's trial began with the voir dire of the jury panel; Torrey then pled not guilty to the indictment's allegations.

After the parties presented their cases, they submitted closing arguments, and the jury convicted Torrey of capital murder. The trial court sentenced him to life in prison, and then he timely filed his notice of this appeal.

---

[12] For instance, the State filed a notice that it was not seeking the death penalty for Torrey's crimes. Torrey filed a document in which he designated the jury to assess his punishment upon his conviction.

**The Legal and Factual Sufficiency of the Evidence
and the Sufficiency of the Nonaccomplice Testimony**

In his first two points, Torrey challenges the legal and factual sufficiency of the evidence to "support the jury's determination that he (as opposed to another person) murdered" Davis and Wilson. He contends that there is no forensic evidence such as fingerprints or DNA that links him to the crimes. He also asserts that there is no evidence tending to connect him to the crimes apart from Anderson's accomplice testimony.

**Legal and factual sufficiency**

### Standards of review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our

8

judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000).

Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Neal v. State,* 256 S.W.3d 264, 275 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 1037 (2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the

9

record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id*. We may not simply substitute our judgment for the factfinder's. *Johnson v. State*, 23 S.W.3d 1, 12 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

**Analysis**

Here, the evidence is legally sufficient to establish Torrey's identity as Davis's and Wilson's murderer. Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Couchman v. State*, 3 S.W.3d 155, 162 (Tex. App.—Fort Worth 1999, pet. ref'd). Such identity may be established by an extrajudicial confession alone. *See Emery v. State*, 881 S.W.2d 702, 706 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1192 (1995); *Gribble v. State*, 808 S.W.2d 65, 70–71 (Tex. Crim. App. 1990), *cert.*

10

*denied*, 501 U.S. 1232 (1991); *Tidrow v. State*, 916 S.W.2d 623, 630 (Tex. App.—Fort Worth 1996, no pet.); *see also Capps v. State*, 244 S.W.3d 520, 526 (Tex. App.—Fort Worth 2007, pet. ref'd) (mem. op. on PDR) (affirming the defendant's conviction for murdering his wife because, in part, "[s]everal women testified that [he] had hinted about or admitted to killing or having hired someone else to kill [her]").

Torrey's extrajudicial confession to Esters unequivocally established that he and Anderson drove to the house on Vinetta Street, where he killed Davis and Wilson. Thus, the evidence enabled a rational trier of fact to convict Torrey, and it is legally sufficient.

The evidence supporting Torrey's conviction is likewise factually sufficient. Torrey did not submit any evidence contradicting the testimony from Esters or Anderson that he committed the murders, and nothing in the record could suggest that anyone other than Torrey killed Davis and Wilson. Also, the physical evidence found by officers, such as the burned blue backpack, the gun clip that was found in the plastic bag, and the .45 caliber bullet casings, corroborated portions of Esters's and Anderson's testimony that related to each of these items. For these reasons, and also in consideration of the remaining facts recited above, we hold that the evidence submitted at trial was not so weak as to make the jury's decision to convict Torrey clearly wrong or

manifestly unjust; therefore, his conviction was based on factually sufficient evidence.

**The accomplice-witness rule**

    **Applicable legal standards**

A conviction "cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). To be an accomplice, the person must be susceptible to prosecution for the offense with which the accused is charged or a lesser-included offense. *See Medina*, 7 S.W.3d at 641.

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Id.* Nor is it necessary for the corroborating evidence to directly link the accused to the commission

12

of the offense. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000).

Rather, the evidence must simply link the accused in some way to the commission of the crime and show that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Malone*, 253 S.W.3d at 257 (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). "Independent evidence which generally tends to prove that an accomplice witness's version of events is true, rather than the version given by the defendant, is considered corroborative, even if it concerns a mere 'detail,' as opposed to a substantive link between the defendant and commission of the offense." *Beathard v. State*, 767 S.W.2d 423, 430 (Tex. Crim. App. 1989); *see also Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993) (noting that "[a]pparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration").

**Analysis**

Esters's testimony about Torrey's extrajudicial confession to her of the murders, along with the physical evidence described above that strengthened Esters's testimony, provided enough evidence independent of Anderson's testimony to support his conviction. *See Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007) (holding that the "appellant's admission that he

13

participated in the crime, although he denied being a shooter, [was] enough to tend to connect him to the offense"), *cert. denied*, 128 S. Ct. 1446 (2008); *Medina*, 7 S.W.3d at 642 (holding that extrajudicial letters from the appellant that indicated his guilt were sufficient to tend to connect him to murder); *Thompson v. State*, 54 S.W.3d 88, 94 (Tex. App.—Tyler 2001, pet. ref'd) (explaining that a "defendant's confession may be sufficient to corroborate the testimony of an accomplice, so long as proof of the confession does not depend upon the testimony of the accomplice").

Torrey asserts that because of the familial relationship between Esters and Anderson, the testimony of Esters should not be deemed sufficient to corroborate the story told by Anderson. However, he cites no authority supporting his assertion that a familial relationship of a nonaccomplice witness to an accomplice witness affects the weight of the nonaccomplice witness's testimony, nor have we found any such authority. Thus, Esters's testimony was sufficiently corroborative; it tended to connect Torrey to the murders. *See* Tex. Code Crim. Proc. Ann. art. 38.14.

For all of these reasons, we overrule Torrey's first two points.

### The Denial of Torrey's Motion for a Mistrial

In his third point, Torrey contends that the trial court erred by denying his motion for a mistrial; he asserts that a juror's conversation with a co-worker

14

denied him due process.  Following a lunch break on the first day of testimony during Torrey's trial, the following exchange occurred between the trial judge and a juror in the judge's chambers:

THE COURT:            You're Ms. Alexander, right?

JUROR ALEXANDER:   Yes.

THE COURT:            I got a message that you think you might know one of the witnesses for the State?

JUROR ALEXANDER:   Yes.

THE COURT:            Do you know who --

JUROR ALEXANDER:   Not the witness.

THE COURT:            Who?

JUROR ALEXANDER:   I think she's going to be in the audience. She just arrived.  She just said she got off work, and I used to work with her.

THE COURT:            You talked to her in the hallway?

JUROR ALEXANDER:   Yeah.

THE COURT:            You know you are not supposed to talk to anybody?

JUROR ALEXANDER:   Oh.

THE COURT:            Remember?

JUROR ALEXANDER:   I just asked her how was she doing.

THE COURT: That's fine. And I didn't make that clear probably because I told you not to talk about the case, but the people who are here around the courtroom are here for this case, and so you can't talk to them at all, but that's okay. We'll talk about that later. So what's her name?

JUROR ALEXANDER: Tye Smith.

THE COURT: Tye Smith. And how do you know her?

JUROR ALEXANDER: I used to work with her at Cash America.

THE COURT: And tell me -- tell me what y'all said out there.

JUROR ALEXANDER: She -- I asked her had she seen my baby yet because I just had a baby.

THE COURT: Congratulations.

JUROR ALEXANDER: Thank you. And I showed her the pictures, and I said, "Do you have jury duty today?" And she was like, "No." She said, "I'm here on trial for -- I'm here for a trial for my cousin." I said, "Oh, do you know what floor you're going to be on?" She said, "Five." I said, "Okay, we are probably in the same room."

THE COURT: Where did you run into her?

JUROR ALEXANDER: We was in the snack bar.

THE COURT: Down on the first floor?

JUROR ALEXANDER: Yeah.

THE COURT: There is no way you would have known. So, any problems with that?

JUROR ALEXANDER: No.

16

THE COURT: Do you think that you're going to need to vote in favor of the State because you know one of their family members?

JUROR ALEXANDER: No.

THE COURT: Is knowing this person, Tye Smith, going to cause you to judge the evidence you hear differently?

JUROR ALEXANDER: No.

THE COURT: Is it going to cause you to be biased at all?

JUROR ALEXANDER: No.

THE COURT: Can you make a decision in this case based just on the facts and the law and not on any relationship?

JUROR ALEXANDER: Yes.

THE COURT: So if you decided to find the defendant not guilty, is that going to cause you a problem since you know a family member of the victim?

JUROR ALEXANDER: No.

THE COURT: You sure?

JUROR ALEXANDER: Uh-huh. I don't even see her. I haven't seen her since I quit that job back in March of last year.

THE COURT: So, it's not the kind of relationship that would cause you any problems?

JUROR ALEXANDER: No.

THE COURT: Do y'all live near each other?

17

JUROR ALEXANDER:   I don't know where she stay.

THE COURT:   Well, all right.  Anything else you want to tell me?

JUROR ALEXANDER:   No.

The trial judge informed the parties about this conversation, and then the following colloquy took place between the trial judge, the State's attorneys (Ms. Guy and Ms. Johnson), and Torrey's counsel (Mr. Cummings):

MR. CUMMINGS:   I don't know who Tye Smith is nor who Tye is related to.

MS. GUY:   And I'm not familiar with Tye Smith.  That name doesn't ring a bell.

MR. CUMMINGS:   You're not very helpful.

MS. GUY:   I'm sorry, I was just sitting here listening.

MS. JOHNSON:   Betsy Smith, I wonder.

MS. GUY:   Maybe.  Betsy is the mother of one of the victims.

THE COURT:   I mean, I don't think it matters.  I said, I don't think it matters.  You know, the record is that she reported it as soon as she was supposed to.  She did that.  She knows not to talk to people about the case.  When she heard they were coming to the fifth floor, she quit talking.  As far as I can tell, there is no juror misconduct.  She has stated for the record that it would make absolutely no difference to her at all and, you know, I'm just telling you-all because I'm supposed to tell you.

MR. CUMMINGS:   You made inquiry in chambers on the record?

18

THE COURT: Oh, yes.

MR. CUMMINGS: Okay.

THE COURT: And it's there, and you can have it. And I think I recited it relatively close to what actually was said, because it hasn't been that long. Tomorrow I won't remember, but . . .

. . . .

MR. CUMMINGS: Your Honor, I think in the interest of my client, I am going to go ahead and move for a mistrial based upon what you just said.

THE COURT: That's denied.

MR. CUMMINGS: Thank you, Your Honor.

**Applicable legal standards**

We review a trial court's ruling on a motion for a mistrial using an abuse of discretion standard, viewing the record in the light most favorable to the trial court's ruling and upholding that ruling if it was within the zone of reasonable disagreement. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007); *Stewart v. State*, 221 S.W.3d 306, 310 (Tex. App.—Fort Worth 2007, no pet.); *see also Gamboa v. State*, No. AP-75,635, 2009 WL 928552, at *7 (Tex. Crim. App. Apr. 8, 2009) (applying the abuse of discretion standard to the denial of a motion for a mistrial based on alleged jury misconduct). A trial court abuses its discretion in denying a motion for a mistrial only when no

19

reasonable view of the record could support the court's ruling. *Webb*, 232 S.W.3d at 112.

When reviewing a trial court's decision regarding potential jury misconduct, an appellate court should defer to the trial court's resolution of the historical facts and its determinations concerning credibility and demeanor. *See Quinn v. State*, 958 S.W.2d 395, 401 (Tex. Crim. App. 1997). Thus, if the trial court believes a juror's statements that despite having an alleged improper communication with a third party, the juror can still render an impartial verdict, an appellate court should generally defer to the trial court's decision to deny a mistrial. *See Robinson v. State*, 851 S.W.2d 216, 230 (Tex. Crim. App. 1991), *cert. denied*, 512 U.S. 1246 (1994); *see also Gamboa*, 2009 WL 928552, at *7 (holding that because a juror testified that he could remain impartial despite overhearing a conversation about the case he was serving on, the trial court did not abuse its discretion in denying a mistrial); *Quinn*, 958 S.W.2d at 402 (holding that despite a juror's statement to a coworker during the middle of a trial that a defendant on trial for sexual assault should "play drop the soap," the appellate court should have deferred to the trial court's denial of a motion for new trial because the trial court was "free to believe" testimony that the juror "was not in any way influenced"). Also, a juror's "tangential acquaintance" with someone connected to a trial does not justify

20

reversal of a defendant's conviction when the juror affirms that he or she can be fair and render a fair verdict. *See Anderson v. State*, 633 S.W.2d 851, 853–54 (Tex. Crim. App. [Panel Op.] 1982) (holding that the trial court's denial of a challenge to the juror's qualifications for cause was not reversible error).

**Analysis**

As Torrey concedes in his brief, the relationship between Ms. Smith to Torrey's case, if any, is unclear. None of juror Alexander, Torrey's counsel, nor the State's attorneys knew of Ms. Smith's connection to Torrey or the victims. Ms. Smith was not called as a witness to either establish her connection to the case or to testify as a fact witness to Torrey's crime. Alexander, after discovering that Ms. Smith was present for a trial on the same floor of the courthouse as the case Alexander was serving on, merely indicated to the trial judge, "I think [Ms. Smith] is going to be in the audience"; nothing in the record indicates that Ms. Smith actually observed the proceedings.

Next, regardless of any relationship that Ms. Smith may have had to either Torrey or the victims, Alexander affirmed to the trial court that her former co-worker relationship with Ms. Smith would not influence her verdict, would not cause her to be biased, and would not cause her to judge evidence differently. The trial court recited Alexander's affirmation in this regard when it decided that there had been no misconduct.

21

Also, the record establishes that Alexander's relationship to Ms. Smith was tangential. Alexander stated that she had not had contact with Ms. Smith in almost a year's time.[13] Alexander also indicated that she did not know where Ms. Smith lived and that her relationship with Ms. Smith was not the kind that would cause her any problems.

Finally, when Alexander received the first indication that Ms. Smith could have been connected with Torrey's case, she terminated the conversation. The conversation never developed to concern the facts of Torrey's case, Torrey's guilt or innocence, sympathetic statements regarding the victims, or other related matters.[14] *See Kelly v. State*, 792 S.W.2d 579, 587 (Tex. App.—Fort Worth 1990) (deciding that the trial court correctly overruled the defendant's motion for a mistrial because a juror's comments "did not constitute conversations about [the defendant's] specific case," and there was therefore "no injury"), *aff'd*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

For these reasons, applying the standards set forth above, we conclude that the trial court did not abuse its discretion by denying Torrey's motion for

---

[13] Alexander indicated that she had not seen Ms. Smith since "March of last year"; Torrey's trial occurred in February 2008.

[14] We note that Torrey has not cited any authority holding that there was reversible juror misconduct under facts analogous to those in this case.

a mistrial based on Alexander's alleged misconduct.  Therefore, we overrule Torrey's third point.

## The Exclusion of a Lesser-included Offense from the Jury Charge

In his fourth point, Torrey contends that the trial court erred by refusing to include his requested jury instruction regarding the lesser-included offense of aggravated robbery.[15]  We use a two-step analysis to determine whether Torrey was entitled to a lesser-included offense instruction.  *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993).  First, the lesser offense must come within article 37.09 of the code of criminal procedure.  Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 2006); *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  "An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged."  Tex. Code Crim. Proc. Ann. art. 37.09(1); *see also Hall*, 225 S.W.3d at 536.  This inquiry is a question of law.  *Hall*, 225 S.W.3d at 535.  It does not depend on the evidence to be produced at trial but is performed by comparing the elements of

---

[15] During the parties' discussion of the jury charge with the trial judge, Torrey's counsel requested the inclusion of an application paragraph for aggravated robbery; the trial court denied this request.

the offense as they are alleged in the indictment or information with the elements of the potential lesser-included offense. *Id.* at 525, 535–36.

Second, some evidence must exist in the record that would permit the jury to rationally find that if Torrey is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672–73. The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the Torrey of the greater offense (capital murder) while convicting him of the lesser-included offense (aggravated robbery). *See id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *See id.* Anything more than a scintilla of evidence may be sufficient to entitle Torrey to a lesser charge. *See Hall*, 225 S.W.3d at 536.

As the State concedes, aggravated robbery, under the legal theory alleged in counts two and three of Torrey's indictment, is a lesser-included offense of capital murder under article 37.09.[16] *See Bradford v. State*, 178 S.W.3d 875, 877 (Tex. App.—Fort Worth 2005, pet. ref'd); *Martinez v. State*, 131 S.W.3d

---

[16] Counts two and three essentially alleged that Torrey committed capital murder because he intentionally caused Wilson's and Davis's death while committing robbery. *See* Tex. Penal Code Ann. § 19.03(a)(2).

22, 39 (Tex. App.— San Antonio 2003, no pet.) (explaining that because "the proof necessary for capital murder committed in the course of a robbery contains the elements necessary for aggravated robbery, aggravated robbery may be a lesser included offense of capital murder"). Thus, Torrey has satisfied the first prong of the test described above.

However, he cannot satisfy the second prong, because no jury could rationally find that, under the evidence presented, he was guilty of aggravated robbery but not guilty of capital murder. *See Hall*, 225 S.W.3d at 536; *Salinas*, 163 S.W.3d at 741. A person commits aggravated robbery when the person commits robbery[17] and the person also (1) causes serious bodily injury to another; (2) uses or exhibits a deadly weapon; or (3) causes bodily injury to another person or threatens or places another person in fear of imminent bodily injury or death, if the other person is 65 years of age or older or disabled. Tex. Penal Code Ann. § 29.03(a) (Vernon 2003).[18] Here, no jury could rationally determine from the evidence described above that Torrey caused serious bodily injury to Davis and Wilson or that he used a deadly weapon

---

[17] *See* Tex. Penal Code Ann. § 29.02. (Vernon 2003).

[18] Nothing in the record indicates that either Davis or Wilson were over sixty-five years old or that they were disabled. We will limit our analysis to the first two ways of committing aggravated robbery as described by section 29.03(a).

25

against them, but that he did not intentionally kill them. Torrey did not present any theory at trial regarding an alternate cause of Davis's and Wilson's death; rather, during closing arguments, his counsel theorized that Anderson's and Esters's testimony was untruthful, and counsel also emphasized that there was no DNA or other physical evidence directly linking him to the scene of the murders.

If the jury had believed Torrey's counsel, and if it had completely discounted Anderson's and Esters's testimony, it would have concluded that Torrey was not at the crime scene, and it could not have convicted Torrey of aggravated robbery. Thus, he was not entitled to an aggravated robbery instruction. *See Hall*, 225 S.W.3d at 536; *Salinas*, 163 S.W.3d at 741. We therefore overrule his fourth point.

**Conclusion**

Having overruled all of Torrey's points, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 4, 2009

27