Hardy Don CAPPS, Appellant,

v.

The STATE of Texas, State.

No. 2–05–175–CR.

Court of Appeals of Texas,
Fort Worth.

Dec. 6, 2007.

Rehearing Overruled Jan. 17, 2008.

Discretionary Review Dismissed
March 12, 2008.

William H. 'Bill' Ray, Law office of William H. 'Bill' Ray, P.C., Fort Worth, TX, for Appellant.

Richard Alley, (Special Prosecutor) Fort Worth, Jana Jones District Atty. for Jack & Wise Counties, Decatur, TX, for Appellee.

Panel A: CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

## MEMORANDUM OPINION [1] ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

LEE ANN DAUPHINOT, Justice.

Pursuant to rule of appellate procedure 50, we have reconsidered our previous opinion on Appellant Hardy Don Capps's petition for discretionary review.[2] We withdraw our judgment and opinion dated October 18, 2007, and substitute the following.

A jury convicted Appellant of murder and assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000. The trial court sentenced him accordingly. Appellant brings six points on appeal, arguing that the trial court erred by refusing to quash the prospective venire panel and by denying a mistrial when the prosecutor improperly interjected his personal opinion as to Appellant's guilt during voir dire and final argument, respectively (points one and six); that the evidence is both legally and factually insufficient (points two and three); and that the trial court erred by excluding impeachment evidence and by admitting Appellant's jailhouse conversations (points four and five). Because we hold that the evidence is both legally and factually sufficient to support the jury's verdict and that the trial court did not err, we affirm the trial court's judgment.

### SUMMARY OF FACTS

Appellant's wife Gina Capps was killed on December 16, 1995. Her body and her pickup were found off of Highway 59 in Jack County, Texas, about five miles outside of Jacksboro.

Lane Akin, the Texas Ranger who investigated the murder, testified that when he arrived at the scene, he discovered a pickup truck parked by the side of the road. The truck's window was down, and the engine was still running. Inside the truck, he found a two-year-old child, unharmed, strapped into a car seat. In a ditch beside

---

1. *See* TEX.R.APP. P. 47.4.

2. *See* TEX.R.APP. P. 50.

the truck, he found the body of Gina Capps. Akin observed both slash and cut wounds to the body. He concluded that there had been a struggle outside the truck and that a knife had been used to cause the wounds during the struggle. The medical examiner testified that the complainant was killed with a knife with a serrated edge.

Akin spoke with Appellant, the complainant's husband, who suggested Michael Dearick, the complainant's former husband, as the possible killer, explaining that Dearick had been abusive to the complainant in the past and was currently behind on child support. Appellant stated that the complainant and Dearick had planned to meet for a child visitation exchange that morning in Jacksboro.

Michael Dearick testified that Gina had been insured and that the primary beneficiary was Appellant. Dearick also testified that he owed $8,000 in child support to Gina but claimed that they had worked out the arrearage between themselves. Dearick also admitted that he had been jailed twice for "mess[ing] with" Gina but claimed that they had had no problems when they met in Jacksboro the day she was killed. Lisa Callahan, who was Dearick's wife on the day of the murder, testified that she had been with him when he picked up Gary, his child with Gina, from Gina around 8:45 a.m. that day.

In explaining his own whereabouts, Appellant claimed variously that he had gone deer hunting, that he had gone to his office, that he had gone to check on oil wells, and that he had stayed in bed until being notified to call the sheriff's office. Appellant denied that there were problems in his marriage to Gina and denied knowing that Gina was planning to leave him. He admitted that he and Gina had had one argument during their three-and-a-half-year marriage.

Appellant told Akin that on December 16,

> The alarm had gone off. They had gotten up early. He went outside to check the oil on her car, and I think at one point he said it was at 6:35 a.m. on that misty morning when he went out to check the oil, the water, and the transmission fluid on . . . her pickup.
>
> He helped her get the boys ready, and then she left at about 7:00 and drove toward Saint Jo.

Appellant also told Akin that he drove behind Gina for about fifteen or twenty minutes in that direction, that he received the phone call about the murder around 10:00 a.m. at home, and that he then drove to Jacksboro, stopping in Nocona to get gas.

Appellant talked to then deputy sheriff Danny Nash, now the sheriff of Jack County. Appellant told Nash that "they had got[ten] up around 6:00 o'clock. Gina dressed and then dressed the two boys, and they ate. He [then] went out and checked the oil and water in the pickup." Appellant stated that he left the house at around 7:15 a.m. that morning, after Gina did, to go check the wells. When he got back home, the telephone company called to give him the phone number of the Jack County Sheriff's Office.

Nash testified that Appellant called the sheriff's office between 9:56 and 9:58 and that the logs reflected that. The log in Defense Exhibit 5 does not contain an entry for when Appellant called, but it does contain an entry at 9:51 providing, "Contact family. Texas Ranger" and a series of numbers. The dispatcher testified that he believed that this entry indicated that the sheriff had called him to contact the family, the Texas Rangers, a deputy, and the highway patrol. He further testified that he believed that he was

talking to Appellant within a matter of minutes.

Gina's older son testified that he was seven years old when his mother was killed. He testified that Appellant did not get out of bed before he and his mother and brother left the house on the morning of his mother's death and did not go out and check the oil and water in her pickup. The youth also testified that things were "pretty good" for the most part between his mother and Appellant, except when Appellant was drinking and "all that other stuff," and that Appellant would not return his mother's kiss that morning, which was unusual.

Appellant testified that he had lied to the police in all of his statements, that he had checked the oil and water in Gina's pickup around 2:30 or 3:30 a.m. on the morning of her death, that he had not gotten up before she and the children left that morning, and that he did not leave the house until he got the telephone call from the telephone company sometime before noon asking him to call the sheriff, which he did immediately.

Akin testified that it takes less than an hour to drive from Appellant's home in Montague County to Jacksboro.

Deputy Nash testified that Curtis Keck had given him a knife that was similar to the knife Keck had given Appellant for Christmas. The knife was admitted into evidence as State's exhibit 45. Curtis Keck testified that he was Appellant's cousin and had given Appellant a serrated knife as a gift the day before Gina died. Keck also testified that Appellant kept the knife in his pickup and that the knife he had given Appellant was similar to State's exhibit 45. Keck testified that he had seen Gina and Appellant together the night before her death and that Gina had seemed afraid that day, but he did not know why. Keck testified that Appellant went drink-

ing at the VFW Hall that night. Keck testified that Appellant showed no emotion regarding Gina's death and that he had to force Appellant to go to Gina's funeral. Later, Appellant told Keck not to say anything about his not going deer hunting the day Gina died. Keck also testified that he never again saw the knife that he had given Appellant and that Appellant never told him what had happened to it.

Appellant consented to a search of his home and his pickup. The officers found knives and a sharpening stone, but according to Ranger Akin, the pickup "looked as if it had been Armoralled, so it was spotless," and no blood was found on the knives.

Dr. Wayne Porter, a veterinarian, testified that sometime between 8:00 and 10:00 a.m. on the day of the murder, he had seen someone whom he believed both at the time of the sighting and at the time of trial to be Appellant in Bowie, about twenty-five miles from the murder scene.

Randall Bell testified that on the morning of Gina's death, as he was leaving Bowie, close to Jacksboro, he saw a small car traveling very fast and swerving on the road, crossing the center line. Inside the vehicle were a man and a woman. The man was taking his jacket off. The vehicle passed him going toward Bowie. About four miles and a short time later, he saw a person that he thought, but was not completely sure, was Appellant driving a white pickup very fast and swerving on the road approaching him. A short while later, he saw the murder scene and the pickup truck parked there. Bell told Pete and Gayle Abbott, Gina's sister and brother-in-law, what he had seen. They told him that there had been a life insurance policy on Gina. Later, a friend of Appellant's called and told Bell not to tell anyone what he had seen. Evidence showed that Bell had

told the Texas Rangers that he thought Appellant had killed Gina for the insurance money.

Luz Garcia testified that she was with Randall Bell when the first erratically driven car passed them on the highway. She did not initially remember another vehicle's passing them before they came upon Gina's blue pickup truck parked on the side of the highway. After the prosecutor refreshed her memory, she remembered the second vehicle that was "speeding and driving crazy." When the State published her out-of-court statement to the jury, however, the sequence of events was clear. She had said at that time,

> Randall [Bell] said something about two vehicles that were speeding and driving crazy; this was between Bowie and Jacksboro. I do not remember that kind of vehicle. Before we got to Jacksboro, we saw two vehicles on the side of the road. They were on my left. It was so long ago, I can't remember what type of vehicles.

> Randall said one of the vehicles looked like one that belonged to a friend. He said it looked like a vehicle that belonged to Gina.

Marlin Thompson, who had met Appellant while they were in jail together, claimed that Appellant had told him that he had kept his hands clean by having someone else kill his wife for him. Thompson claimed that Appellant had told him that he had hired a man and a woman to kill his wife, but he gave no names. Thompson said that Appellant told him that the couple knew Gina and were connected to him because he was their methamphetamine cook. Thompson said that Appellant claimed that he had been in the vicinity of the murder when the two people committed it for him and that as he left the scene alone in his pickup truck bound for Bowie, he had been seen on the road by someone who knew him. Thompson claimed that Appellant had told him this story about a month before trial.

Thompson admitted that he was present in the courtroom at a pretrial hearing when there was a discussion of a witness (Dr. Porter) who could almost certainly identify Appellant. Defense counsel inquired what Thompson expected to gain from testifying for the State. Thompson denied that he would receive a benefit.

Kim Lemons testified that when she was involved with Appellant in 1996, he had told her that "he had it done" to Gina and for her not to tell because "you and your kids could be done just as easy." She said that Appellant had told her that if he could not have his son Colby, no one could.

Patricia Burnett testified that about a month after Gina's death, she had asked Appellant if he had killed her. She testified that he replied, "[N]o, he had it hired done."

Lynn Glasker testified that she had known Appellant since 1976. He began calling her at the end of September 1995. He told her that he had problems in his marriage to Gina and needed someone to talk to. After Gina's death, Appellant told Lynn that Gina had been a bitch. He had wanted a divorce, and she refused to give him one.

Kim Flowers testified that she had known Appellant and had dated him off and on for a few years. Once when Appellant was drunk, he threatened to cut off her breasts and stuff them down her throat. He then told her that he knew the location of the murder weapon that his wife had been killed with. When Flowers asked Appellant about the murder, he said he did not kill Gina but he knew who did. Later, he denied that statement.

Appellant remarried after Gina's death. The State recovered taped conversations

Appellant had with his wife Kelly, his mother, and Cindy Hedeman. Dick Johnson, a Texas Ranger, testified that the Wichita County Jail had the equipment set up to record telephone conversations. The calls themselves showed that the party receiving calls was aware that the calls were being recorded and, according to the State, was waiving confidentiality as to the Jack County calls. Johnson stated that he reviewed all of Appellant's calls.

Kelly Capps, Appellant's new wife, testified only after being offered immunity. She testified that she and Appellant did not marry until May 5, 2003, and that the relevant conversations with Appellant she relayed in her testimony (as opposed to those taped when Appellant was confined) occurred before the marriage. She testified that she had met Appellant six years before his trial. She claimed that Appellant had talked to her about the murder weapon used to kill Gina. Kelly testified that Appellant had claimed that he knew where the murder weapon was. Appellant also told her that Gina had wanted a divorce. Kelly claimed that at one point, Appellant had told her the name of the man who had killed Gina. She also testified that when he got mad at her, he told her, "I've got away with it once. I'll do it again," or "What happened to her will happen to you." Kelly testified that she was afraid of what Appellant would do to her if he found out that she had betrayed him. She admitted that she had used drugs throughout her relationship with Appellant and that, although still married to Appellant, she was at the time of trial pregnant by another man. Kelly also testified that Appellant had her write him a letter saying that she had lied in her earlier statements about him.

Shawn Nix testified that she had lived with Kelly, Appellant, and Appellant's son Colby for a short time in either 2001 or 2002. She testified that while she was living with them, Appellant had told Kelly and her that Gina got what she deserved and referred to Gina as "the bitch." She also testified that Appellant would tell Colby that they were better off without "Momma." Mark Peterson, a criminal investigator with the Jack and Wise County District Attorney's Office, interviewed the two-year-old Colby on the day that his mother was killed. In response to Peterson's questioning about who had hurt Colby's mother, Colby answered that he did not know but stated that his brother had left with a woman and confirmed that he had spoken with a woman. Appellant was present when Peterson questioned Colby, and Peterson said that Colby would not allow his father to leave. Ultimately, Peterson testified that he gained no evidentiary value from his conversation with the two-year-old Colby.

Frankie Hess testified that he was Appellant's employer and that Appellant drove a red and white truck. A re-enactment of Gina's murder was broadcast on television. The only information received in response to the re-enactment came from a truck driver who provided information that pointed to someone other than Appellant as the culprit. No fingerprint or DNA evidence connected Appellant or anyone else to the murder.

## SUFFICIENCY OF THE EVIDENCE

The jury was charged on the law of parties. The jury charge therefore allowed the jury to convict Appellant as a principal or a party. Appellant gave conflicting accounts of his actions on the day of the murder. Several women testified that Appellant had hinted about or admitted to killing or having hired someone else to kill Gina. While some witnesses who testified that they saw Appellant near the scene of the murder were hesitant in their

identification, Porter was sure enough that it was Appellant that he thought about "running him down" to talk about a particular well when he saw him on the morning of the murder. At trial, Porter's level of certainty was the same.

Appellant's cousin testified that he had given Appellant a knife with a serrated edge. The knife that was admitted as State's exhibit 45, which Appellant's cousin had given to a sheriff's deputy and which Appellant's cousin testified was similar to the knife he had given Appellant, was consistent with the knife that caused the fatal stab wound. Witnesses testified that Appellant had told them that he knew where the weapon that killed Gina was.

Based on our review of the evidence, as detailed above, and applying the appropriate standards of review,[3] we hold that the evidence is legally and factually sufficient to support the jury's verdict. We overrule Appellant's second and third points.

## PROSECUTOR'S PERSONAL OPINION

■ In his first and sixth points, Appellant argues that the trial court reversibly erred by refusing to quash the prospective venire panel when the prosecutor injected his personal opinion about Appellant's guilt at the beginning of voir dire and by refusing to declare a mistrial when the prosecutor injected his personal feelings about Appellant's guilt during final argument. In voir dire, the prosecutor explained the concept of the presumption of innocence. In his explanation, he stated that he and the district attorney would not be there if "[they] didn't think that [they] could prove something." Appellant objected to the expression of personal opinion, and the trial court sustained the objection and instructed the jury to disregard. Appellant moved to quash the venire panel, and the trial court overruled the request.

■ In final argument, during the guilt phase of the trial, the prosecutor stated, "[W]e submit there is no reasonable doubt. There's—I wouldn't think there's any doubt at all." Appellant objected to the statement of personal opinion, and the conscientious trial court sustained the objection, instructed the jury to disregard the statement, and denied Appellant's motion for mistrial. When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial (or motion to quash the venire panel), the issue is whether the trial court abused its discretion by denying the motion.[4] Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, that is, "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required.[5] In determining whether the trial court abused its discretion by denying the mistrial, we balance three factors: (1) the

3. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Hampton v. State, 165 S.W.3d 691, 693 (Tex. Crim.App.2005) (both providing legal sufficiency standard of review); Watson v. State, 204 S.W.3d 404, 414–15, 417 (Tex.Crim.App. 2006); Drichas v. State, 175 S.W.3d 795, 799 (Tex.Crim.App.2005); Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App.2003); Johnson v. State, 23 S.W.3d 1, 8–9, 11–12 (Tex. Crim.App.2000); Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App.1997) (all providing factual sufficiency standard of review).

4. Hawkins v. State, 135 S.W.3d 72, 76–77 (Tex.Crim.App.2004) (concerning mistrial); Mendoza v. State, 552 S.W.2d 444, 446–47 (Tex.Crim.App.1977) (concerning quashing venire panel).

5. Hawkins, 135 S.W.3d at 77; see also Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim.App.2003), cert. denied, 542 U.S. 905, 124 S.Ct. 2837, 159 L.Ed.2d 270 (2004).

severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct.[6]

The prosecutor made the statement during voir dire as he was distinguishing "actual" from "presumed" innocence and did not repeat it. The statement during closing argument occurred after the prosecutor said, "[W]e submit there is no reasonable doubt," and appears to refer more to the strength of the State's case based on the evidence, as viewed by the prosecutor, than the prosecutor's personal opinion of Appellant's guilt.[7] We note that the prosecutor later stated that Appellant was "100 percent guilty" with no objection. Finally, the record contains legally and factually sufficient evidence from several sources of Appellant's guilt. Consequently, we cannot say that the trial court abused its discretion by refusing to quash the venire panel or by denying a mistrial. We overrule Appellant's first and sixth points.

### IMPEACHMENT OF COMPLAINANT'S GOOD CHARACTER

■ In his fourth point, Appellant argues that the trial court reversibly erred by refusing to allow him to introduce before the jury evidence of Gina's extramarital affairs and felony theft probation. Michael Dearick and Gayle Abbott testified that the complainant was a good mother. Dearick testified that she never gave anyone any trouble and took care of her children. Abbott also testified that her sister

would not have pulled over for a stranger. In response, Appellant attempted to inquire into both witnesses' knowledge of Gina's felony theft probation and extramarital affairs. The trial court did not allow the inquiries.

Appellant argues that he wanted to show that Gina might have pulled over for a man other than him because she had an affair during their marriage. Appellant cites no law for the proposition that the trial court erred by refusing to allow him to impeach Dearick's and Abbott's opinion of the complainant. Appellant, therefore, has failed to preserve that complaint on appeal.[8]

■ Further, we do not view the witnesses' testimony that Gina was a good mother and would not have pulled over for a stranger as testimony of her good character. Regardless, Dearick testified without objection that Gina "was a great mom. She really never g[a]ve you any trouble. She took care of her kids" and answered affirmatively that that was a priority for her. While Appellant did object to the prosecutor's asking Dearick if Gina would have pulled over on the side of the road for a stranger, he did not object when Abbott testified that Gina was a very good mom and would not have pulled over for a stranger. Appellant has therefore failed to preserve a complaint about the State's offering evidence of the deceased's character, if that was his complaint.[9] We overrule Appellant's fourth point.

6. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim.App.1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

7. *See Wolfe v. State,* 917 S.W.2d 270, 281 (Tex.Crim.App.1996) ("[T]he prosecutor may argue his opinions concerning issues in the case so long as the opinions are based on the evidence in the record and not as constituting unsworn testimony.").

8. *See* TEX.R.APP. P. 38.1(h); *Tong v. State,* 25 S.W.3d 707, 710 (Tex.Crim.App.2000), *cert. denied,* 532 U.S. 1053, 121 S.Ct. 2196, 149 L.Ed.2d 1027 (2001); *Mosley,* 983 S.W.2d at 256.

9. *See* TEX.R.APP. P. 33.1(a)(1); *Mosley,* 983 S.W.2d at 265; *Fuentes v. State,* 991 S.W.2d 267, 273 (Tex.Crim.App.), *cert. denied,* 528

## RECORDED STATEMENTS

■ Appellant objected on the bases of hearsay, privilege, and nonhearsay statements of a coconspirator to the admission of the recorded conversations between him and his wife Kelly and his mother, contained in State's exhibits 69, 70, and 71. The recordings in exhibits 69 and 70 were made when Appellant was incarcerated in the Wichita County Jail; the recordings in the remaining exhibit were made when he was incarcerated in the Jack County Jail. Appellant also complained that Ranger Johnson could not properly authenticate the accuracy of the recordings. In his fifth point, Appellant raises the same grounds on appeal.

Initially, we hold that the calls were not privileged because Appellant did not have the requisite expectation of privacy.[10] Appellant concedes that he signed a statement acknowledging that the telephone calls might be monitored by the Wichita County Sheriff while he was in that county's jail. He therefore had no expectation of privacy in the recordings in State's exhibits 69 and 70. While the record contains no similar document signed when he was in the Jack County Jail, Appellant testified that he knew that all of his telephone calls were being recorded. Further, exhibit 71, containing the calls from Jack County, did not contain calls between him and his wife. Consequently, none of the calls were privileged.

■ Appellant appears to argue that his own statements were hearsay. The defendant's recorded statements against interest offered in a criminal case are not hearsay.[11] Further, to the extent that Appellant complains that the other parties' words in the conversations were improperly admitted over his hearsay objections, we note that those seven words spread over three conversations—"Yes," "Yeah," "Yes," "Yeah," "Yeah," "Right," and "Right"—do not appear to have been offered for the truth of the matter asserted, and, even if they were, could have had no impact on his conviction.

■ Appellant argues that the most egregious evidentiary ruling concerning the taped conversations was the ruling allowing Ranger Johnson to testify to the authenticity of the tape recordings. Specifically, Appellant appears to complain about the part of the recording indicating that Appellant was an inmate placing calls from each jail. He contends that there is no other indication that the recordings were made in the jails. Appellant cites no law for his authenticity argument and has therefore failed to preserve it.[12] Appellant also argues that his mother's voice was not identified on the tapes. Although Appellant directs us to a reference to an "unidentified" voice on pages 333–335 of the third volume of the reporter's record, Appellant does not direct us to the portion of the record in which he raised this specific complaint below; he has therefore also failed to preserve it.[13] In the interest of justice, however, we note that rule 901 of the Texas Rules of Evidence provides in relevant part,

---

U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999).

10. *See* Tex.R. Evid. 504(a).

11. *See* Tex.R. Evid. 803(24).

12. *See* Tex.R.App. P. 38.1(h); *Tong*, 25 S.W.3d at 710; *Mosley*, 983 S.W.2d at 256.

13. *See Lawton v. State*, 913 S.W.2d 542, 554 (Tex.Crim.App.1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996), *overruled on other grounds*, *Mosley*, 983 S.W.2d at 263; *Alvarado v. State*, 912 S.W.2d 199, 210 (Tex.Crim.App.1995).

**(a) General Provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) *Testimony of witness with knowledge.* Testimony that a matter is what it is claimed to be.

. . . .

(5) *Voice identification.* Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at anytime under circumstances connecting it with the alleged speaker.[14]

In addition to the information provided by the recordings, Texas Ranger Dick Johnson testified that the exhibits were of Appellant's recorded jailhouse conversations, that he had obtained the exhibits from Wichita County jail personnel and that he had reviewed them at that jail, and that the recording in exhibit 71 occurred in Jack County Jail. He also identified most of the voices on the recordings [15] and testified that he had interviewed Appellant before his confinement. We note that the jury also heard Appellant's live testimony. Consequently, we hold that the trial court did not abuse its discretion by overruling the objections as to authenticity.

Finally, to the extent that Appellant is complaining again here in a roundabout way about privilege, he testified that he signed a release regarding his conversations at Wichita County Jail, that he knew his jailhouse telephone conversations were being recorded, and that he was confined from September 16, 2003 until trial. Ranger Johnson testified to the dates of the telephone conversations recorded without objection regarding the dates, and those dates all fall within Appellant's period of confinement.

■ In addition to the grounds raised at trial, Appellant argues for the first time on appeal that the recordings contain statements about plea bargaining in violation of rule 410 of the Texas Rules of Evidence.[16] Appellant did not raise this complaint below and therefore has not preserved it for appeal.[17] We overrule Appellant's fifth point.

## CONCLUSION

Having overruled Appellant's six points, we affirm the trial court's judgment.

---

14. *See* Tex.R. Evid. 901.

15. *See Jones v. State,* 80 S.W.3d 686, 689 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (stating appellate court is unwilling to read into rule 901 a requirement that each person, no matter how irrelevant to case, be identified by name).

16. Tex.R. Evid. 410.

17. *See* Tex.R.App. P. 33.1(a)(1); *Mosley,* 983 S.W.2d at 265.