# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00749-CR

---

**Thomas Gene Peiser, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 119TH DISTRICT COURT OF RUNNELS COUNTY
### NO. 6685, THE HONORABLE BEN WOODWARD, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellant Thomas Gene Peiser was charged by indictment with three felony offenses—murder (Count I), *see* Tex. Penal Code § 19.02(c), tampering with physical evidence of a human corpse (Count II), *see id.* § 37.09(a)(1), (c), and tampering with physical evidence, a firearm (Count III), *see id*. § 37.09(a)(1). The jury found appellant guilty of the charged offenses, found the enhancement paragraphs true, and assessed appellant's punishment at life in prison for each offense. In six issues, appellant challenges the sufficiency of the evidence and contends that the trial court abused its discretion in admitting his wife's out-of-court statements and his jailhouse telephone conversations with her. For the following reasons, we affirm the judgments of conviction.

BACKGROUND

The jury heard evidence that Ike Tapia hired Antonio Romo to paint a trailer and that Romo then hired appellant to do the work. The job was completed, and Tapia paid Romo $350 for the work and picked up the trailer around noon on September 21, 2017. In the early afternoon of September 21, Romo drove to appellant's house where appellant lived with his wife Tamatha Peiser (Ms. Peiser) and their children. "[A] little after 2:30," one of appellant's neighbors who was in her back yard "heard just this loud pop" coming from the direction of the back of the Peisers' house. Around that time, Ms. Peiser had driven to a friend's house and told her friend that appellant "had beaten [Romo] completely down." Ms. Peiser's friend got in the car with Ms. Peiser, and as they were driving, they saw appellant driving Romo's truck about two blocks from the Peisers' house coming from the direction of the house, but they did not see Romo. Ms. Peiser dropped her friend off at another residence, and the friend "flagged" Ms. Peiser's mother down as she was driving to pick up her grandchildren and told her what had happened. After picking up her grandchildren and dropping them off, "which was two minutes from that area," the mother came back to the residence "about 3:35, 3:40" and saw Ms. Peiser. Ms. Peiser told her mother what had happened, including that appellant shot Romo, and the mother called 911.

Shortly thereafter, the police chief went to that residence—where Ms. Peiser and her mother were at the time—and spoke with the mother. The police chief then went to the Peisers' house where he found appellant alone. Appellant told the police chief that Romo had left earlier with Tapia and that appellant had just gotten out of the shower. The police chief noticed Romo's truck behind the house and looked in the open passenger window. He observed "a lot of blood" in the seats and "passenger floorboard area." He went into the house with

2

appellant and observed blood on the floor around the kitchen table and on a rag laying on the floor. He placed appellant under arrest, and the police and others began searching for Romo. Before dark, a volunteer fire fighter found Romo's body a few miles north of town in a rural area "[o]ut in the weeds" between two sheds. Romo had died by a gunshot wound to his head.

After appellant was arrested, Ms. Peiser consented to the police searching the Peisers' house, and the police obtained evidence of blood on the house's floor and other items found in the house, including a towel in the washing machine. They also found "a large amount of blood" in Romo's truck "concentrated in the passenger seat area to the center console," blood around the door lock on the driver's side of Romo's truck, and blood on appellant's clothes, including camouflage shorts and boxer shorts, and on the boots he wore that day. By the time that the police chief had arrived, appellant had showered and changed out of those clothes, but he was wearing the boots when he was arrested. The police also found a can of .38 ammunition with some ammunition missing in a bedroom drawer of the Peisers' house, but they did not locate a firearm.

Appellant was subsequently indicted for murder and two counts of tampering with evidence, and the State's case against him proceeded to a jury trial in September 2019. The witnesses during the trial's guilt-innocence phase included responding officers, the police chief, the county sheriff, the neighbor who heard the "loud pop" coming from the direction of the Peisers' house, Ms. Peiser's friend, Ms. Peiser's mother, the volunteer fire fighter who found Romo's body, Tapia, and Tapia's daughter-in-law. Tapia testified about his agreement with and payment to Romo for painting the trailer and going with Romo around noon on the day of Romo's murder to pick up the trailer. Tapia's daughter-in-law testified about a text message and call that she received on the day of the murder. The daughter-in-law testified that based on

3

Tapia's instruction, she sent a text message to appellant that Tapia "had not made any deals with him" and that after she sent the message, she received a call from a female who wanted to know "how much money has been paid to Tony Romo."

The witnesses also included a forensic scientist who provided evidence that matched Romo's DNA to blood found in the Peisers' house and on appellant's boots, camouflage shorts, and boxer shorts,[1] and the forensic scientist who performed the autopsy on Romo's body. She determined that Romo's death was caused by a contact gunshot wound and testified that the muzzle of the gun was up against Romo's temple, that the bullet passed completely through, that Romo's forehead had a recent contusion caused by a significant force around the time of death, and that there were no visible defensive injuries or injuries to Romo's hands. The autopsy report and the reports matching Romo's DNA to blood found on certain items of appellant's clothes and his boots and in the Peisers' house were admitted as exhibits.

Ms. Peiser did not testify at trial, claiming spousal privilege, *see* Tex. R. Evid. 504, but Ms. Peiser's friend and mother, the police chief, and a responding officer testified about statements that Ms. Peiser made to them around the time that Romo was murdered. The police chief testified that when he asked Ms. Peiser what had happened, she told him that "there had been an altercation" between appellant and Romo, that "she had seen [appellant] with a black handgun that she thought was a .38, and he had stated that he was going to end this," that she was afraid "[Romo] had been injured," that she saw appellant driving Romo's truck but did not

---

[1] The forensic scientist testified that the laboratory did not perform a DNA analysis on all the samples that were "presumptively positive for blood" based on "guidelines of how much evidence [they] will work in a given case." The scientist explained that they would "always like to be able to work everything, but [they] do not have the resources to do that. So part of [their] training and part of [their] experience is determining what is in the first round of testing. . . . In the first round, we try to pick what's going to be the most useful or probative for the case."

see Romo, that she saw appellant when he came back to the house and got out of the truck, that appellant "had blood all over his shirt and his shorts," and that appellant "asked her to go get gasoline so he could burn the clothes." Ms. Peiser's friend testified that Ms. Peiser told her that she was supposed to be getting gasoline because appellant wanted it, that appellant "had beaten [Romo] completely down," and that she said, "[H]e did it, [she knew] he did it." Ms. Peiser's mother testified that Ms. Peiser told her that appellant "was beating on [Romo]" while she was telling Romo "just to tell him where the money [was]," that appellant "had a gun to [Romo's] head," and that appellant shot Romo. Consistent with a body cam recording admitted as an exhibit, the officer testified that Ms. Peiser told him about blood in Romo's truck and appellant's request for her to go get gasoline to burn clothes. In the recording, Ms. Peiser appears emotional, stressed, and crying, and when asked if she was with appellant when it happened, she responded to look in the truck, that there was blood in it and on clothes, that appellant asked her to go get "gas to burn his clothes," that appellant's clothes were in the kitchen, and that appellant was in the shower.

Recordings of jailhouse telephone conversations between appellant and another person and between appellant and Ms. Peiser also were admitted as exhibits. In the telephone conversations with his wife, appellant is heard telling his wife that he "probably will be gone the rest of [his] life," that "it just went that far," that she should not talk to the police or "no one," and that they cannot make her testify against him. He also asked her to get an "idea" of "what all" they took from the house. In another recorded call, appellant is heard telling his wife that he was "so sorry" and "it wasn't worth it," that she should not talk to anyone, and that "no one [was] there but [him] so it was [his] word against no one's word." He also asked her about his "camo shorts" and said that "there is no denying" that "they can match blood" on his boots. And

5

in another recorded call, appellant is heard telling his wife that it was "self-defense on [his] part," that "[Romo] came to [appellant's] house with a pistol," and they "got in [the truck], and it went off when they were fighting over it." In one of the recorded conversations with another person, appellant said that he "appreciate[d]" the person cutting the spot out of the floor "where [he] hit him in his f…ing mouth," "just going to f…k him," and asked the person if he had put something in place of the cutout spot. In the other recorded call, appellant stated that the Texas Rangers asked him where the weapon was in the middle of that night, and in response to the person saying that they were searching "all over the place" but that the person did not know if they found anything, appellant stated that "hopefully they won't" and he "wish[ed] [he] knew how to get it though."

The defense called Ms. Peiser's mother who testified that she heard Ms. Peiser say that "somebody needs to kill [Romo]" six months before he was murdered. The mother also testified that around one year after the murder, right before Ms. Peiser went into a permanency placement hearing for her children at the courthouse, Ms. Peiser stated that she "should have told everyone that I shot and killed [Romo]." On cross-examination, the mother testified that she had seen guns at the Peisers' house, including a revolver, a .38 or .45, "a year or two prior" to the murder and that Ms. Peiser told her that it was appellant's.

The jury found appellant guilty of all three counts as charged, and following the trial's punishment phase, the jury found the enhancement paragraphs true, and assessed appellant's punishment at life in prison for each offense. The trial court thereafter signed judgments of conviction in accordance with the jury's verdict. This appeal followed.

6

## ANALYSIS

Appellant's first three issues challenge the sufficiency of the evidence to support his convictions, and his remaining three issues challenge evidentiary rulings. We first address his evidentiary challenges and then turn to our sufficiency review.

## Evidentiary Rulings

In his fourth and fifth issues, appellant challenges the trial court's admission of jailhouse telephone conversations between appellant and his wife and, in his sixth issue, appellant challenges the admission of his wife's out-of-court statements.

### *Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). "An abuse of discretion does not occur unless the trial court acts 'arbitrarily or unreasonably' or 'without reference to any guiding rules and principles.'" *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). Further, we may not reverse the trial court's ruling unless the determination "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley*, 493 S.W.3d at 83. "An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case." *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

*Jailhouse Telephone Conversations and Spousal Privilege*

In his fourth issue, appellant argues that the trial court abused its discretion when it held that his jailhouse telephone conversations with his wife while he was incarcerated awaiting trial were not privileged. "A person has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made to the person's spouse while they were married." *See* Tex. R. Evid. 504(a)(2). "A communication is 'confidential' if a person makes it privately to the person's spouse and does not intend its disclosure to any other person." *Id.* R. 504(a)(1).

In this case, at the beginning of the recorded telephone calls between appellant and his wife, a prerecorded message advised them that the calls were being "recorded and subject to monitoring," and the sheriff testified that "when they're booked in," inmates are told in the inmate handbook that jailhouse telephone calls are recorded and that signs in the telephone area provide further notice that the calls are recorded and subject to monitoring. Thus, because the evidence showed that appellant was made aware that the telephone calls were being monitored and recorded, his conversations with his wife were not private, and the trial court did not abuse its discretion in concluding that the spousal privilege did not apply. *See id.*; *Capps v. State*, 244 S.W.3d 520, 529 (Tex. App.—Fort Worth 2007, pet. ref'd) (holding that jailhouse calls between spouses were not privileged when defendant was aware that calls might be monitored). We overrule his fourth issue.

*Jailhouse Telephone Conversations and Right of Privacy*

In his fifth issue, appellant argues that the trial court erred in overruling his objections to the admission of the recorded jailhouse telephone conversations with his wife

8

because he had not voluntarily waived his constitutional right to privacy with his spouse and had a continuing expectation of privacy when he made jailhouse calls. Appellant asserts that he should have been admonished of the consequences of the recordings, including the potential that they would be used against his interests.[2] As support, appellant relies on cases that address whether a defendant freely and voluntarily waived constitutional rights. *See, e.g.*, *Carroll v. State*, 42 S.W.3d 129, 133 (Tex. Crim. App. 2001) (addressing whether defendant "knowingly, voluntarily, and intelligently waived her federal constitutional right against self-incrimination at sentencing"); *Reyna v. State*, 478 S.W.2d 481, 482 (Tex. Crim. App. 1972) (addressing whether defendant freely and voluntarily waived right to trial by jury, confrontation of witnesses, and other constitutional rights).

It is well-established, however, that a defendant does not have "the requisite expectation of privacy" in jailhouse calls with his spouse when there is notice that the calls are being monitored. *See State v. Scheineman*, 77 S.W.3d 810, 811–12 (Tex. Crim. App. 2002) (explaining that defendant does not have legitimate expectation of privacy while incarcerated (citing *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984))); *Capps*, 244 S.W.3d at 529 (holding that jailhouse call between spouses was not privileged because defendant "did not have the requisite expectation of privacy"); *see also Hudson*, 468 U.S. at 527–28 (explaining that loss

___

[2] Appellant argues that he "was coerced by circumstances of his incarceration to abandon and waive a valuable constitutional right by force of government action" and "did not, or at least should not, have been made to intentionally relinquish and abandon a constitutional right to privacy in his interspousal communications merely because he wanted to use a telephone to talk to [his wife] and, of necessity, had to use a jailhouse phone system to do so." Appellant asks this Court to "re-examine" his contentions "with a view to whether the constitutional rights of inmates may so easily be abridged by the use of a monitoring telephone system employed by a jail." He recognizes an inmate's loss of privacy in the interest of "institutional security" but argues that this interest may be reconciled with an inmate's right to privacy with interspousal communications by requiring the system to inform the inmate that in addition to institutional security, other purposes of the recordings include their potential use for incrimination of a crime.

of privacy is "inherent incident[] of confinement"); *Woodberry v. State*, No. 05-18-00728-CR, 2019 Tex. App. LEXIS 5577, at *22–23 (Tex. App.—Dallas July 2, 2019, no pet.) (mem. op., not designated for publication) (explaining that "courts have uniformly rejected the contention that an inmate has a legitimate expectation of privacy in phone calls with non-lawyers where . . . there is notice that the calls are monitored" and concluding that appellant "had no objectively reasonable expectation of privacy in his outgoing phone calls from the jail"); *Hernandez v. State*, No. 14-08-00319-CR, 2009 Tex. App. LEXIS 6356, at *7 (Tex. App.—Houston [14th Dist.] Aug. 13, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding that conversations between spouses that were made in back seat of police car were not protected by spousal privilege because "[t]here is no reasonable expectation of privacy in the back seat of a police car").

Because appellant did not have an objectively reasonable expectation of privacy when he was speaking to his wife on the jailhouse telephone system, we conclude that the trial court did not abuse its discretion in admitting the recordings of those telephone conversations over appellant's objections. We overrule his fifth issue.

*Out-of-Court Statements*

In his sixth issue, appellant argues that the trial court abused its discretion when it admitted his wife's out-of-court statements in four different instances because "they were inadmissible hearsay and not 'excited utterances.'" He complains about out-of-court statements that his wife made to her friend and mother, the police chief, and an officer.

The excited-utterance exception to the rule against hearsay allows the admission of out-of-court statements "relating to a startling event or condition, made while the declarant

10

was under the stress of excitement that it caused." Tex. R. Evid. 803(2); *see Coble v. State*, 330 S.W.3d 253, 294 (Tex. Crim. App. 2010) (explaining that "critical question . . . is not the specific type of emotion that the declarant is dominated by—anger, fear, happiness—but whether the declarant was still dominated by the emotion caused by the startling event when she spoke"). "The exception is based on the assumption that the declarant is not, at the time of the statement, capable of the kind of reflection that would enable him to fabricate information." *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). For the excited-utterance exception to apply, (1) the exciting event must be startling enough to evoke a truly spontaneous reaction from the declarant, (2) the reaction to the startling event must be quick enough to avoid the possibility of fabrication, and (3) the resulting statement should be sufficiently related to the startling event to ensure the reliability and trustworthiness of that statement. *McCarty v. State*, 257 S.W.3d 238, 241–42 (Tex. Crim. App. 2008). Factors that the trial court may consider in determining whether the exception applies include the length of time between the occurrence and the statement, the nature of the declarant, whether the statement was made in response to a question, and whether the statement was self-serving. *Apolinar*, 155 S.W.3d at 187.

Appellant relies on testimony that his wife's "natural demeanor" was "*always* excited," the "intervening time periods between statements" in the four different instances, and "the self-serving nature of [his wife's] statements" to support his position that the challenged out-of-court statements were not excited utterances. He argues that it "strains credulity that her best friend, her mother, and two police officers could not quiet her down during the intervening time periods between the statements to each of them" and relies on Ms. Peiser's statement to her mother about a year later that she shot Romo. The challenged statements, however, were made within a time frame that other evidence showed was shortly before or shortly after Romo's

11

murder, and the statements were made soon after Ms. Peiser saw appellant beating and holding a gun to Romo's head or soon after she saw appellant returning with blood on his clothing and blood in Romo's truck.

The witnesses who testified about Ms. Peiser's statements also testified about their observations of her when she was making the statements about what happened. The police chief testified that when he initially saw her, she was "crying and wandering around" and that later, she was "still crying and upset," "stuttering and stammering," and that it was "difficult to understand what she was saying"; her friend described her as "[f]rantic," "uneasy," "[f]reaking out," "scared," and under "a lot" of stress; her mother described her as "frantic," "in shock," and "just going off and off"; and the officer described her as "pretty distraught," "heavy breathing," "very emotional," "crying," and "having trouble" telling him what she saw. Although Ms. Peiser's mother answered "[p]retty much" when asked whether Ms. Peiser is normally "histrionic" and her friend testified that "[s]he's pretty excited mostly all the time," her friend also testified "but never in a scared sort of way . . . like she was that day." The body cam recording of Ms. Peiser also shows her appearing to be dominated by her emotions—stressed and distraught—when she was speaking with the officer. *See Coble*, 330 S.W.3d at 294.

On this record, we cannot conclude that the trial court abused its discretion in admitting the challenged out-of-court statements as excited utterances. *See* Tex. R. Evid. 803(2); *Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003) (concluding that statements made 20 hours after incident by individual who was "scared to death" and "tired" were excited utterances). We overrule appellant's sixth issue.

12

**Sufficiency of the Evidence**

In his first three issues, appellant contends that the evidence was legally insufficient to support his convictions.

*Standard of Review*

Due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313–14 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). When reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018); *see Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 319; *see Braughton*, 569 S.W.3d at 608. Our "role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016); *see also* Tex. Code Crim. Proc. art 36.13 (stating that generally "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we "may not reevaluate the weight and credibility of the evidence" and substitute our judgment for that of the factfinder. *Braughton*, 569 S.W.3d

13

at 608; *Arroyo*, 559 S.W.3d at 487; *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (stating that reviewing court "must not usurp" jury's role by "substituting its own judgment for that of the jury"). Instead, we must defer to the factfinder's credibility and weight determinations. *Braughton*, 569 S.W.3d at 608; *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016). When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *Cary*, 507 S.W.3d at 757. We "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). The standard of review is the same for direct and circumstantial evidence cases. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). "Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

*Count I: Murder*

In his first issue, appellant contends that the evidence was legally insufficient to establish that he intentionally or knowingly caused Romo's death by shooting Romo with a firearm. He argues that "beyond" the evidence that "Romo's blood was in [the Peisers'] house and in Romo's car," "the jury was asked to speculate that [appellant] was Romo's shooter and that he had intentionally murdered Romo." He contends that "there was no specific murder weapon linked to [him]" and relies on the lack of eyewitness testimony to Romo's murder and Ms. Peiser's mother's testimony that Ms. Peiser "later admitted that *she* killed Romo."

The jury, however, reasonably could have inferred from the evidence that appellant intentionally shot and killed Romo. *See Murray*, 457 S.W.3d at 448 (explaining that appellate courts determine whether necessary inferences are reasonable based upon combined and cumulative force of all evidence when viewed in light most favorable to verdict); *Acosta*, 429 S.W.3d at 625 (explaining that jury may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from evidence). The evidence showed that over a period of a few hours: (i) appellant and Romo had an altercation over payment for painting Tapia's trailer; (ii) appellant beat Romo and held a gun to his head at the Peisers' house; (iii) the neighbor heard a "loud pop" coming from the direction of the back of the Peisers' house; (iv) around the same time, Ms. Peiser had left the Peisers' house and was with her friend; (v) shortly after that, Ms. Peiser and her friend saw appellant driving Romo's truck away from the Peisers' house but did not see Romo; (vi) after appellant returned to his house, he took a shower and changed his clothes; (vii) there was a large amount of blood in Romo's truck and blood in the residence; (viii) Romo's body was found in the direction that

15

appellant was seen driving Romo's truck; (ix) Romo was shot in the head at close range; and (x) Romo's blood was found on the clothes appellant had been wearing.

Among the evidence that the jury could have credited were Ms. Peiser's statements to others around the time of the murder, appellant's statements to his wife on the recorded telephone calls while he was incarcerated, and the testimony of Ms. Peiser's mother about the gun she had seen at the Peisers' house a few years before the murder. The officer testified that Ms. Peiser told him that there had been an altercation between appellant and Romo, that "she had seen [appellant] with a black handgun that she thought was a .38, and appellant stated that he was going to end this," that she saw appellant driving Romo's truck but did not see Romo, that she saw appellant when he came back to the house and got out of the truck, that appellant "had blood all over his shirt and his shorts," and that appellant "asked her to go get gasoline so he could burn the clothes." Ms. Peiser's mother also testified that Ms. Peiser told her that appellant had beaten, shot, and held a gun to Romo's head on the day of the murder and that she had seen a revolver, a .38 or .45, at the Peisers' house a few years before the murder that Ms. Peiser told her belonged to appellant. In the telephone conversations with his wife, appellant is heard telling his wife that he "probably will be gone the rest of [his] life" because "it just went that far," that he was "so sorry" and "it wasn't worth it," and that "no one [was] there but [him] so it was [his] word against no one's word." He also asked her about his "camo shorts" and said that "there is no denying" that "they can match blood" on his boots. And in another recorded call, appellant is heard telling his wife that it was "self-defense on [his] part" and that "[Romo] came to [appellant's] house with a pistol" and that "it went off when they were fighting over it" in Romo's truck.

16

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found that appellant intentionally caused the death of Romo by shooting him with a firearm. *See* Tex. Penal Code § 19.02(b)(1); *Jackson*, 443 U.S. at 319; *Braughton*, 569 S.W.3d at 607–08. We overrule appellant's first issue.

*Count II: Tampering with Evidence of a Human Corpse*

In his second issue, appellant contends that the evidence was legally insufficient to establish that he tampered with evidence of a human corpse as alleged in the indictment. The indictment alleged that he "intentionally and knowingly alter[ed] or conceal[ed] a human corpse with intent to impair its availability as evidence in any subsequent investigation or official proceeding related to the offense." *See* Tex. Penal Code § 37.09(a)(1).

Relying on evidence that he contends supports that Romo was shot where his body was found and the lack of other evidence, appellant argues that: (i) there was no evidence that Romo's body was altered or concealed or concerning appellant's "*intent* with regard to the impairment of the body as evidence"; (ii) there was no evidence that Romo's body had been moved after death; (iii) "there was no expert opinion about whether Romo was dead when he exited the truck into the field"; (iv) the evidence of blood in the truck and the autopsy that "revealed the body had only two injuries besides the killing head shot" "suggest[] that Romo died where his body was found"; and (v) "blood found in the truck means Romo was alive and his heart was still pumping blood as he sat in the truck." He also argues that the location where Romo's body was discovered "does not prove alteration or concealment" when the "body was not buried, covered with brush or otherwise necessarily hidden from view." He contends that it

17

"was relatively easily located," "found not far from town, unburied, uncovered and otherwise in plain view, if off the road."

The forensic scientist who performed the autopsy testified that bullet fragments were not found in Romo's body and that the bullet passed completely through, and her report reflects that the time of death was unknown, but the police were unable to find the bullet fragments, either at the Peisers' house or at the location where Romo's body was found. The jury, however, reasonably could have inferred from the combined and cumulative force of the evidence that appellant shot and killed Romo in Romo's truck at the Peisers' house and then drove Romo's body to the location where it was found with intent to conceal it. *See Murray*, 457 S.W.3d at 448. In addition to the evidence that Romo's blood was on the clothing and boots that appellant was wearing, the jury could have credited the neighbor's testimony that she heard a "loud pop" coming from the direction of the Peisers' house, the photographic and other evidence that Romo was shot in the head at close range, the significant amount of blood in Romo's truck that was concentrated on the passenger side to the console, and appellant's admission in the recorded telephone conversation with Ms. Peiser that he was in the truck with Romo when Romo was shot (although appellant claimed self-defense). *See Acosta*, 429 S.W.3d at 625.

The jury also could have credited photographs admitted into evidence showing that Romo's body was discovered in a rural field between two sheds and testimony from officers and the volunteer fire fighter that Romo's body was discovered in a rural area "[o]ut in the weeds" between two sheds a few miles north of town and that the body was not visible from the road. The volunteer fire fighter testified that after he was told that there were stalks of Johnson grass stuck in Romo's truck, he decided to "go out north" of town because there is a lot of

18

Johnson grass in that direction and "secluded areas that would have been about ideal for the situation." The volunteer fire fighter discovered tire tracks on a caliche road that "were coming out of the foliage in the corner of [an] intersection." He "noticed that somebody had been cutting firewood out of the old pecan trees" and "knew something was definitely not right" when he "realized that the tracks coming out of the foliage went over the wood pile." He then got out of his vehicle, "walked through the tracks for about thirty or forty yards" "to where [he] could see over the high foliage," and found Romo's body.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found that appellant tampered with the evidence of a human corpse as alleged in the indictment. *See* Tex. Penal Code § 37.09(a)(1); *Jackson*, 443 U.S. at 319; *Braughton*, 569 S.W.3d at 607–08. We overrule appellant's second issue.

*Count III: Tampering with Evidence of a Firearm*

In his third issue, appellant contends that the evidence was legally insufficient to establish that he tampered with a firearm as alleged in the indictment. The indictment alleged that he "intentionally or knowingly alter[ed] or conceal[ed] . . . a firearm with intent to impair its availability as evidence in any subsequent investigation or official proceeding related to the offense." *See* Tex. Penal Code § 37.09(a)(1). Appellant argues that there was no evidence that "a particular gun" was used to kill Romo or that appellant owned such a gun and that "[t]he absence of physical evidence in this case cannot be itself evidence of the crime charged."

Appellant, however, has not cited and we have not found authority that would have required the State to prove the actual firearm that killed Romo, and in this case, the jury reasonably could have inferred from the combined and cumulative force of the evidence that

19

appellant intentionally concealed the firearm that he used to shoot Romo. *See Murray*, 457 S.W.3d at 448. The jury could have credited the evidence that: (i) Ms. Peiser's mother saw a revolver, .38 or .45, a few years before the murder at the Peisers' house that Ms. Peiser told her belonged to appellant; (ii) on the day of the murder, Ms. Peiser saw appellant holding a gun to Romo's head; and (iii) on the day of the murder, the police found a can of .38 ammunition at the Peisers' house with some ammunition missing from the can. The jury also could have credited appellant's statements on the recorded telephone conversation that the Texas Rangers were asking him where the weapon was in the middle of night, and in response to the person saying they were searching "all over the place" but that the person did not know if they found anything, appellant stated that "hopefully they won't" and he "wish[ed] [he] knew how to get it though."

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found that appellant tampered with a firearm as alleged in the indictment. *See* Tex. Penal Code § 37.09(a)(1); *Jackson*, 443 U.S. at 319; *Braughton*, 569 S.W.3d at 607–08. We overrule appellant's third issue.

## CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgments of conviction.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed:   October 27, 2021

Do Not Publish